GEORGE HUNTER, Appellee, v. COLFAX CONSOLIDATED COAL COMPANY, Appellant.

**MASTER AND SERVANT:** Workmen's Compensation Act—Non-
1, 25  Negligence of Employer. The Workmen's Compensation Act
(Secs. 2477-m to 2477-m51, Code Supp., 1913,) does not impose *absolute* liability on an employer who elects to reject the provisions of the act—does not deprive such employer of the right to plead and submit to a jury the defense that he was *wholly blameless* for an injury to an employee.

Note: The above is true even in light of the fact that an employer who elects to reject the act is placed under the following handicaps, viz:

1. Denied the right to plead assumption of risk (a) inherent in the employment, or (b) incident to failure to furnish a safe place to work, safe tools, etc.

2. Denied the right to plead the exercise of reasonable care in selecting competent employees.

3. Denied the right to plead the negligence of a co-employee.

4. Denied the former benefits of contributory negligence, except in so far as such negligence reveals (a) willfully self-inflicted injuries and (b) injuries caused by intoxication; and

5. *Presumed* to have been proximately negligent in the event of an injury to the employee in the course of his employment, with resulting burden of proof on him (the employer) *to show to the contrary.*

NEGLIGENCE: Contributory Negligence—Workmen's Compensation
2 Act—Willfully Self-Inflicted Injuries—Drunkenness. Contributory negligence is a defense still preserved to an employer who elects to reject the provisions of the Workmen's Compensation Act, in so far only as such negligence shows (a) willfully self-inflicted injuries, and (b) injuries caused by the employee's intoxication.

STATUTES: Construction—Radical Innovations—Judicial Legisla-
3 tion. Radical departures from long-established rules of law will not be *construed* into existence. They must be *created* by plain words, not of the judiciary but of the legislature. So *held* under the claim that the Workmen's Compensation Act deprived an employer who elected to reject the act of the right to establish that he was wholly blameless for an act.

STATUTES: Construction—Strained Applications of Terms. Pro-
4 visions of a connected statute, manifestly intended to be comprehensively complete in itself, cannot, by judicial construction alone, be bodily lifted out of the statute and held to apply solely to another statute enacted prior to the one in question. So *held* with reference to the claim that the provision of the Workmen's Compensation Act (enacted in 1913) which creates a *presumption* of proximate negligence against the employer and places on him the burden of proof to show the contrary was intended to have application, not to the act in which it was found, but solely to the Mining Act (enacted in 1911).

STATUTES: Construction—Contradictory Construction. A provision
5 of a statute cannot be held to have some application and at the same time to be surplusage only.

MASTER AND SERVANT: Workmen's Compensation Act—Inherent
6 Risk of Employment—Scope of Doctrine. The risks which "arise out of, inhere in, or are incidental to, an employment," have never been so generally held by the courts to include those risks only which occur *without fault of the master* as to justify the court in holding that the Workmen's Compensation Act, in taking from

a non-accepting employer the right to plead the assumption of such risk by the employee, intended to deprive the employer of the right to plead that he was wholly blameless, especially when Sec. 2477-m of the act provides a way by which the employer may show that he was not negligent—was blameless.

**CONSTITUTIONAL LAW:    Construction, Etc.—Constructions Leading to Invalidity—Avoidance.** The desire of the court is to shield, if possible, every statute from every charge of unconstitutionality. Between two possible constructions, the court will hold to that which preserves, rather than to that which destroys.

PRINCIPLE APPLIED: In the construction of the Workmen's Compensation Act, the court had under consideration that part of Sec. 2477-m which abolished the right of the employer to plead "assumption of risk inhering in an employment," when construed in connection with that further part of the same section providing that it shall be presumed, in case of injury to an employee, that the employer was proximately negligent, and must assume the burden to show to the contrary. Two constructions were possible: first, that said provisions imposed on the employer an *absolute* liability, even though he was blameless; and, second, that the employer was privileged to show that he was wholly blameless for the injury. The first would render the act of doubtful constitutionality. The second would clearly preserve the act from constitutional objections. *Held,* the latter holding must prevail.

**CONSTITUTIONAL LAW:    Construction, Etc.—"Eighteenth Century Constitution"—"Twentieth Century Conditions."** The question is not what the Constitution *ought* to authorize, in the opinion of the court, but what *does* it authorize. "The Constitution is not a public enemy whom judges are charged to disarm whenever possible."

**APPEAL AND ERROR:    Assignments of Error—Assignments Foreign to Object of Appeal.** When the sole purpose of an appeal is to secure a ruling on the constitutionality of the statute in question, assignments of error based on points wholly foreign to the confessed objects of the appeal will be disregarded.

**CONSTITUTIONAL LAW:    Construction, Etc.—Borrowed Objection.** A statute will not be declared unconstitutional on a borrowed objection—a grievance which can occur only to one not complaining.

**CONSTITUTIONAL LAW:    Construction, Etc.—Theorized Condition—Impairment of Contract.** Inasmuch as the Workmen's Compensation Act expressly exempts from its operation the conditions existing at the time of the passage of the act, and inasmuch as the case at bar concededly arose after said act took effect, the court

declines to pass upon the question whether said act *might*, upon some theorized condition, have the effect of impairing the obligation of contracts.

**CONSTITUTIONAL LAW:** Right to Contract—Invalidating Contracts—Workmen's Compensation Act. The constitutional "right to contract" is limited by the legislative right to invalidate all contracts, rules, regulations or devices:

(a)  Which tend to reduce liability for negligence, or

(b)  Which stimulate a disregard of human safety, or

(c)  Which encourage breaches of contract or statutory obligations entered into, or

(d)  Which, generally, interfere with declared public policy.

*Held*, the following provisions of the Workmen's Compensation Act do not work an unconstitutional interference with the right to contract:

(a)  Prohibiting, generally, any device by which the employer might escape the obligations imposed;

(b)  Prohibiting the withholding of wages;

(c)  Prohibiting the exaction of contributions or insurance premiums;

(d)  Prohibiting the waiver of rights by employees;

(e)  Prohibiting efforts by an employer to induce employees to reject the act; and

(f)  Prohibiting, in effect, contracts of settlement within 12 days of an injury. (Secs. 2477-m2,-m7,-m12,-m17,-m18.)

**CONSTITUTIONAL LAW:** Police Power—Right to Contract—Limitations—Workmen's Compensation Act. The Workmen's Compensation Act leaves both employer and employee the liberty to accept or reject its provisions, and the requirements of the act, in case of acceptance, constitute a proper exercise by the legislature of the general power of "community self-defense,"—the police power,—a power which embraces even the right to abridge, for purposes properly within its scope, the right of contract.

**CONSTITUTIONAL LAW:** Equal Protection of Laws—Classifications—Workmen's Compensation Act. The primary duty of the legislature to classify—to say who shall and who shall not come under the provisions of an enactment—will not be interfered with by the court unless the classification is so *palpably* arbitrary that there can be no room for doubt that discretion has been abused. *Held*, the exclusion from the Workmen's Compensation Act of household or domestic servants, laborers engaged in farm or other agricultural pursuits, and those whose employment is of a casual nature, is a classification supported by authority and reason, and will not be interfered with by the court.

CONSTITUTIONAL LAW:    Construction, Etc.—Borrowed Objection.
10, 15

CONSTITUTIONAL LAW:    Equal Protection of Laws—Classifica-
16  tions—Optional Application—Effect. A statutory classification—
a declaration that certain employees are and certain others are not
within the provisions of the act—cannot be held to be arbitrary
when those included may voluntarily exclude themselves, and those
excluded may, in effect, voluntarily include themselves. So *held*
under the Workmen's Compensation Act.

MASTER AND SERVANT:    Workmen's Compensation Act—Rejec-
17  tion by Employee—Effect. An employee who elects to reject the
provisions of the Workmen's Compensation Act is penalized in
that he arms the employer with the right to plead any and all
defenses which he had the right to plead prior to the passage of
said act. So held by construing Secs. 2477-m,-m2,-m9, as related
sections.

CONSTITUTIONAL LAW:    Equal Protection of Laws—Workmen's
18  Compensation Act—Consequences Attending Acceptance and Re-
jection. The difference in consequences attaching, respectively,·
to rejection and acceptance of the provisions of the Workmen's
Compensation Act by employer and employee is not so manifestly
and palpably arbitrary and such misuse of the conceded power of
the legislature to classify as to justify a holding that the said act
is unconstitutional by reason thereof, some fair differences being
allowable under the police power, in order to equalize the inequality
of positions held by employer and employee.

CONSTITUTIONAL LAW:    Due Process—Workmen's Compensation
19  Act—Compelling Insurance. That feature of the Workmen's
Compensation Act (Sec. 2477-m41, *et seq.*, Code Supp., 1913,)
which requires an employer to insure his liability is not violative
of the ''due process'' clause of our Constitutions, on the theory
that the maintenance of such insurance exacts a *tax* for a purely
private purpose.

TAXATION:    Purpose of Tax—Workmen's Compensation Act—Com-
20  pulsory Insurance—Police Power. The compulsory scheme of in-
surance provided by the Workmen's Compensation Act, to secure
workmen injured in hazardous employments and their dependents
from becoming objects of charity, tends to the accomplishment of
an object well within the ''police power'' of the state, and the
cost, on the employer, of maintaining such scheme of insurance, if
conceded to be a *tax*, is a tax for a *public purpose*, even though
not wholly so.

CONSTITUTIONAL LAW:    Distribution of Powers—Delegation of·
21  Judicial Power—Workmen's Compensation Act. Whether the

procedure provided by the Workmen's Compensation Act for hearing on a claim for compensation, including the appointment of a board of arbitrators, the hearing held and findings made by the board, and the power in the Industrial Commissioner to modify such determinations, is a delegation of *judicial* power, *quaere.* (Secs. 2477-m24 to 2477-m34, Code Supp., 1913.)

CONSTITUTIONAL LAW: Distribution of Powers—Workmen's
22  Compensation Act—Judicial Power of Commissioner and Arbitrators. No *unwarranted* delegation of judicial power is provided in that part of the Workmen's Compensation Act which provides: (a) for filing with the commissioner memorandums of agreements as to compensation; (b) for the approval or disapproval of the same by the commissioner; (c) for the formation of an arbitration board where no agreement as to compensation is reached; (d) for hearings and findings by the said board; (e) for the modification of such findings by the commissioner; (f) for a limited appeal to the courts; and (g) for an entry of a decree by the court on said final findings. (Secs. 2477-m24 to 2477-m34, Code Supp., 1913.)

CONSTITUTIONAL LAW: Distribution of Powers—Total Ouster
23  of Courts—Workmen's Compensation Act. The provisions of the Workmen's Compensation Act providing for the application of the statutory compensation schedules through the agency of a board of arbitrators *do not work a total ouster of the jurisdiction of the court*—do not prevent the courts, in a proper case, from assuming in addition to the powers granted by the act, jurisdiction to determine: (a) whether the act was being enforced against one who had, under its terms, rejected it; (b) whether the claimant was an employee; (c) whether the claimant was even injured; (d) whether the injury was one arising out of the employment; (e) whether the injury was due to the intoxication of the servant or was self-inflicted; (f) whether an award different from the statute schedules had been made; (g) whether fraud had entered into the award; and (h) whether the arbitrators had attempted judicial functions in violation of or not granted by the act.

CONSTITUTIONAL LAW: Distribution of Powers—Judicial Powers
24  —Right of Legislature to Delegate. The legislature has constitutional right both to delegate judicial powers to bodies other than duly constituted judicial tribunals and power to authorize by statute the making of contracts delegating such powers.

MASTER AND SERVANT: Workmen's Compensation Act—Non-
1, 25  Negligence of Employer.

MASTER AND SERVANT: Burden of Proof—Statutory Changes—
26  Constitutionality. The Constitution was not formerly violated in

any of its provisions by the court-made rule that an employee must show that the employer was to blame for his injury: neither is the Constitution now violated by the provisions of the Workmen's Compensation Act that the employer must show that he was wholly blameless.

**MASTER AND SERVANT:   Workmen's Compensation Act—Abolition of Defenses—Constitutional Law.**   Depriving an employer who alone rejects the provisions of the Workmen's Compensation Act of the defenses of contributory negligence, assumption of risk, and negligence of co-servants, violates no constitutional right of the employer, the reasons for such holding being placed, generally, on the thought (a) that such deprivation does not constitute an arbitrary classification, and (b) that such former defenses were only ''court-made'' rules and must yield to statutory policy.

**CONSTITUTIONAL LAW:   Jury Trial—Denial of Right—Workmen's Compensation Act.**   An employer who rejects the provisions of the Workmen's Compensation Act may not say that he is, in reality, denied a jury trial in a personal injury controversy with his employee because said act (a) withdraws from him the right to plead the former common-law personal injury defenses, and (b) relieves the employee of burdens of proof and imposes them on the employer.

**JURY:   Jury Trial—Denial—Workmen's Compensation Act—Constitutional Law.**   An acceptance by an employer of the provisions of the Workmen's Compensation Act (said act providing a proceeding to administer the act without a jury) works an effectual waiver of the employer's right to a jury trial.

**JURY:   Right to Jury—Scope of Right.**   The right to jury trial is not absolute in the sense that it has universal application.   The right exists only in cases where it existed at the adoption of the Constitution.   So held under the Workmen's Compensation Act.

**JURY:   Right to Jury—Federal Constitution.**   The Federal Constitution does not attempt to regulate the granting or denying of jury trial by the state.

**CONSTITUTIONAL LAW:   Due Process—Workmen's Compensation Act.**   No denial of ''due process of law'' or ''equal protection of law,'' or ''abridgement of the privileges and immunities of citizenship'' is occasioned by the Workmen's Compensation Act which provides, *inter alia*, a procedure, through boards of arbitration, the industrial commissioner, etc., for the administration of the act; such phrase, ''due process,'' as employed in the Constitution, not necessarily implying a regular procedure in a court of justice.

**CONSTITUTIONAL LAW:** Privileges and Immunities—Corporations. A corporation is not a "citizen" within the protection of the "privileges and immunities" provisions of the Federal Constitution.

**MASTER AND SERVANT:** Workmen's Compensation Act—Common Law Defenses—Abrogation—Constitutional Law. Depriving the employer of the former common-law personal injury defenses, and relieving the employee of burdens of proof and transferring them to the employer as a penalty for his non-acceptance of the provisions of the Workmen's Compensation Act, do not constitute unreasonable coercion to induce acceptance of the act by the employer, the argument being, (a) that the legislature has undoubted constitutional right to arbitrarily withdraw any or all such defenses, or to change rules of evidence, and (b) that what the legislature may arbitrarily declare, it may conditionally declare— may declare as a penalty for non-acceptance of the act in question.

**MASTER AND SERVANT:** Workmen's Compensation Act—Non-Accepting Employer—Contributory Negligence as Mitigating Damages. An employer who may elect to reject the provisions of the Workmen's Compensation Act may plead contributory negligence of the, employee in mitigation of damages. (Sec. 3593-a, Code Suppl. Supp., 1915.)

*Appeal from Jasper District Court.*—JOHN F. TALBOTT, Judge.

WEDNESDAY, NOVEMBER 24, 1915.

REHEARING DENIED THURSDAY, APRIL 6, 1916.

THE defendant corporation, one that might be subject to the provisions of Chapter 147 of the Acts of the Thirty-fifth General Assembly, popularly known as the Workmen's Compensation Act, has elected to reject the provisions of it.

Plaintiff was in the employ of defendant as a miner, and injured by a fall of coal while in that employment. It is stipulated that, if he be entitled to recover at all, it may be in the sum of $100, with interest at six per cent. from July 24, 1914. Judgment in that sum was entered against defendant, and it appeals.—*Affirmed* in part. *Reversed* in part.

*R. & F. Ryan,* for appellant.

*John T. Clarkson,* for appellee.

*Stipp, Perry & Starzinger* and *Mabry & Hickenlooper,* amici curiae.

Salinger, J.—One defense interposed was that the injury suffered by plaintiff was wholly due to his own negligence. Upon the issue created by this defense, defendant requested, and was denied, trial by jury; because it was the judgment of the trial court that such defense was precluded by the provisions of said act.

1. Master and Servant: workmen's compensation act: non-negligence of employer.

Appellant insists that the act is violative of the Constitution of the United States and of the state, because its provisions deny him the right to make said defense, and to have it tried by jury. If the act does not take these rights from defendant, the claim that taking them is a violation of the fundamental law is disposed of. A statute is not unconstitutional because a court misunderstands it.

Does the act deprive the employer who elects to reject the act of the right of submitting to a jury the defense that it was wholly guiltless? While, as will presently be seen, appellee overlooks the effect of the concession made by him, he does and should concede that, before the act, the master had the right to make this defense, and still has, unless the act has taken it from him. We must, then, turn to the act itself. It provides that the employer may hereafter not avail himself of either or all of the following matters:

1. That the employe "assumed the risks inherent in, or incident to, or arising out of his or her employment."

2. Assumed "the risks arising from the failure of the employer to provide and maintain a reasonably safe place to work."

3. Assumed the risks "arising from the failure of the employer to furnish reasonably safe tools and appliances."

4. That the employer "exercised reasonable care in selecting reasonably competent employes in the business."

5. "That the injury was caused by the negligence of a co-employee."

Of the defenses so taken away, two, those we have numbered 2 and 3, involve the confession of specified acts of negligence on part of the employer, and an avoiding them with claim that the employe has so conducted himself as that he may not complain of injuries arising from such acts of negligence. Manifestly, these provisions but take away a shield against negligence committed by the employer. No law which merely denies the right to excuse a specified negligent act which has been committed can have any bearing on whether it be a defense that no negligent act has been done.

Eliminating the defense that the master used reasonable care to insure competent fellows for the servant is no provision the master shall pay though wholly without fault. It merely provides that proper care in one named respect alone shall not be a defense.

Taking away the defense that the injury was caused by the negligence of a co-employe does just what it does. It provides merely that the employer may not be excused because one of his servants negligently injured another—a provision which leaves entirely open whether there remains the defense that the injury is due neither to the fault of the fellow servant nor to a fault of the employer.

The provision that wilful negligence of the employe, with intent to cause his own injury, or negligence on his part due to his intoxication, remain defenses, deals with cases where both master and servant are or may be in varying degrees to blame, and limits the defense that the master is not liable because the servant contributed to his own injury, to contribution by wilful self-infliction or by negligence due to drunkenness. But that two specified acts of negligence on part of the plaintiff remain a defense does not establish that the employer may not show that, whoever else was to blame, or contributed, or whatever

2. NEGLIGENCE: contributory negligence: workmen's compensation act: willfully self-inflicted injuries: drunkenness.

the mental attitude or condition of the contributor, he (the defendant) was in no manner to blame. Such a provision settles how far the negligence of the employe remains available as a defense, but does not touch the question whether the freedom of the employer from all blame remains a defense.

Nothing thus far adverted to has attempted to make the employer pay damages for injuries suffered in and because of employment given by him, where he is in no manner blameable for such injury. If the act itself has created such absolute liability, it must be done, so far as anything like doing it in terms is concerned, by that part of it which is:

"It shall be presumed [A] that the injury to the employe was the direct result and growing out of the negligence of the employer; [B] and that such negligence was the proximate cause of the injury; and in such cases the burden of proof shall rest upon the employer to rebut the presumption of negligence." Sec. 2477-m (Par. 4), Code Supp., 1913.

This is not a provision the employer has not the right to show that he was wholly free from blame, but that he must take the affirmative upon the claim that he is blameless; that the employe need not prove that the employer was at fault, but the latter must show he was not. That no more than this was intended is, we think, clear, because:

1. Without reference to whether the legislature has power to say that the employer shall pay for an injury for which he is in no manner at fault, such a provision is so radical a departure from what was the law before the enactment of this statute as that such liability should not be construed into existence, but be created by plain words of the legislature.

3. STATUTES: construction: radical innovations: judicial legislation.

2. A consideration of other provisions *in pari materia* strongly indicates that there was no purpose to create absolute liability. For instance, Section 7 is that, if the injury is caused by a stranger and the master is made to pay compensation, he may recover over of the stranger whose fault is responsible for the injury.

3. Nothing but an utterly strained construction of the words of the statute can reach the conclusion that it eliminates the defense that the employer is in no way in fault.

4. It is not a natural construction that a statute has carefully defined how that shall be proven which it declares is no longer a defense; that it prescribes *how* a defense shall be established and, also, that such defense shall not be asserted; that a presumption of fact which the statute says may be rebutted establishes a liability, incontestably.

II. We found it very difficult to get a clear understanding of why appellee contends that, notwithstanding the provision that the master may escape liability if he prove the injury due to no fault of his, the statute should be construed to mean that such want of fault is no defense. We conclude that the following are some of the arguments for such contention:

4. STATUTES: construction: strained applications of terms.

1. The words which declare presumption as to, and the burden of proof on, the absence of negligence on part of the employer, are addressed to cases that may arise under Section 41, Chapter 106, Acts of the, Thirty-fourth General Assembly. This chapter deals with the duty of a miner to properly support the roof of his work chamber and the counter-duty of the employer, and has provision as to visitation of the place of work, and giving proper instructions.

The Compensation Act deals with many employers and employes other than those connected with mining; and the provisions of its Section 4 are limited to cases in which the employer rejects the Compensation Act of which Section 4 is a part.

Said Chapter 106, Acts of the Thirty-fourth General Assembly, is not a workmen's compensation act, and has no reference to the subject of compensation. Section 41 thereof is, in the rough, a regulation confined to the narrow subject of the duties of the mine foreman or pit boss. And neither Section 41 nor all of the chapter depend on the rejec-

tion of any law by the employer. It is unbelievable that the unmistakable general language found in Section 4 of the Workmen's Compensation Act—that in cases where the employer has elected to reject the provisions of an act which deals with actions between various employers and employes for personal injuries, there shall arise a presumption the master was at fault, and the burden be upon him to rebut the presumption—was intended to apply only to said statute of an earlier general assembly, to which, as seen, it can have no logical relation, and not to apply to the very act in which it is found and which, as seen, gives full scope for the operation of the section.

2. It is next urged that this provision on presumption and burden of proof refers to that part of Section 1 of the act which eliminates as a defense assuming the risk of the failure of the employer to provide and maintain a

5. STATUTES: construction: contradictory construction.

reasonably safe place to work, the risk of his failure to furnish reasonably safe tools or appliances, and the risk of his failure to select reasonably competent fellow employes.

Each of these defenses is eliminated by the act. As will presently be seen, the appellee also argues that the provision as to presumption and burden of proof is mere surplusage, because the act eliminates assumption of risks which are inherent in, incidental to or arising out of the employment. Manifestly, both positions cannot be sound. If taking away the defense of assuming the risks inherent to the employment makes mere surplusage of provisions as to presumptions of negligence against the master and his burden of proving freedom from negligence, then these provisions cannot be accounted for with the claim that they are not idle because they may operate on defenses such as assuming the risk of negligent fellow servants. If the elimination of one assumption of risk makes the provisions of Section 4 waste words, then the taking away of another assumption of risk cannot

give life to and account for the presence of Section 4. It is impossible in logic that words in a statute have nothing to operate upon because one defense of assumed risk is eliminated from the statute in which the words are found, and that at the same time construing these words to be useless may be avoided with the claim that they apply to other defenses of assumed risk, which the same statute has also eliminated.

3. It is insisted that, by eliminating the defense that the employe had ''assumed the risks inherent in or incidental to or arising out of'' the employment, the act made idle its said other provisions as to presumptions and burden of proof. This is without meaning unless intended to assert that the two are in such sense equivalents that, when the legislature took away the assumption of risks inherent in, arising out of, or incidental to the employment, it must have intended to eliminate the defense that the injury was in no degree due to act or omission of the employer. Or, as appellee puts it, when this defense was eliminated, ''it was equivalent to saying that the employer shall not escape liability, regardless of fault.'' (Brief, 58.) In other words, the only risks which arise out of, inhere in, or are incidental to, the employments regulated by the act are risks of injuries that occur without fault of the employer; therefore, the legislature took away the defense of being wholly without fault. Wherefore, in turn, it is manifest that, no matter how absurd it may seem, the legislature took the trouble to make provisions which make rules about proving a thing which the same act took out of existence.

If the elimination by Section 1 of three specified assumptions of risk which arise from default of the employer is to mean that the legislature thus exhausted the entire field of assuming the negligence of the employer, and that, consequently, the further provision of the section which takes away

the defense of assuming risks "inherent in or incidental to or arising out of" the employment has nothing to operate upon other than assumption of what occurs without the fault of the employer, then it is difficult to understand why Division B of Section 3 should proceed on the theory that Section 1 has not eliminated all assuming of the fault of the employer, in that Section 3 provides consequences for a fault on his part not mentioned in Section 1, and speaks of this additional negligence of the master as another "assumed risk," eliminated as a defense.

This contention presupposes, too, what is contrary to common knowledge, that injuries arising from causes not inherent in, or incidental to the employment, and not due to the fault of the employer, do occur.

## B.

Again, such argument presupposes that, whenever an employe has been denied recovery on the ground that his injuries arose from assuming such inherent risks, it was so universally a mere holding that the master was no contributor to the injury as that the legislature must have understood, when it took away the defense that there was such assumption, that it was eliminating the defense that the master had in no degree contributed.

It is true it has been held the servant may not recover where his injury is due to inherent risks assumed by him, because allowing such recovery would compel the master to pay for injuries for which he was not to blame. In *Ives v. South Buffalo R. Co.* (N. Y.), 94 N. E., at 433, right column, the New York Compensation Act is held to be invalid because the abolition of the defense of assumed inherent risks operates to dispense with proof that the master was negligent. This reasoning is sustained in 3 Labatt (2d Ed.), Sec. 1186a, p. 3188; 5 Labatt, Sec. 1647, p. 5047; and in Webb's Pollock on Torts (Enlarged American Edition), page 196. But it is not sufficient that this is the holding of some authorities, nor

sufficient for the purposes of the present point if, as they do not, the greater number of authorities so held. To make out a case for the proposition that the legislature could have intended nothing but taking away the defense that the master was wholly free from fault when it eliminated the defense of inherent risks assumed, it must be made to appear that it was so universally understood that precluding a recovery for injuries due to such inherent risks was a method of shielding the employer from paying for injuries due to no fault of his, as that the legislature must have intended, by taking away the defense of assumption, to also take away the alleged basic defense which it is claimed the defense of assuming inherent risks effectuated. Measured by this standard, we find ourselves under no compulsion to attribute such intent to the framers of this act.

Here, as elsewhere, many texts and decisions are cited by way of illustration and argument—to point out, for instance, what the holdings on a subject are in other jurisdictions, to show that in those jurisdictions a position more drastic than the one we take is sustained. Unless it is said here, in terms, that references to such are an approval or adoption of them for this jurisdiction, our reference to or analysis of them must not be construed to mean that these shall be held to rule similar controversies when presented here.

The great preponderance does not place the defense upon the footing of a plea that the master should not pay for what he is not to blame for.

It is held in *Bria v. Westinghouse,* 117 N. Y. S. 195, that "the very doctrine of assumption of risk by a servant has reference to risks which exist by the negligence of the master, i. e., by his failure to use reasonable care." *Schmitt v. Hamilton Mfg. Co.,* 115 N. W. 353; *Zentner v. Oshkosh Gaslight Co.,* 112 N. W. 449; *Corrigan v. West Div. S. S. Co.* (Wis.), 113 N. W. 441; and *Walaszewski v. Schoknecht,* 106 N. W. 1070, all decided by the Supreme Court of Wisconsin, all

involve a concession that the defense of assumption of risk inherent in a calling may be invoked in cases where the master was guilty of some negligence. And it is said in 3 Labatt (2d Ed.), Sec. 1186a, pp. 3189, 3190, that:

"It should be noted also that statutes which in terms abolish the doctrine of assumption of risk as a defense go no further than to abolish the defense where the servant is injured by reason of the master's negligence, and do not abolish assumption of risk where the master has not been negligent."

In *Holmes v. Mather,* L. R., 10 Ex., at page 267, it is suggested that the defense rests both upon the absence of fault on part of the one whose act causes an injury, and the inability to recover for that which arises from taking ordinary risks. And other cases found themselves upon a dual basis, i. e., want of fault on part of the master, and denial of the right to recover for what flows from taking the ordinary and inherent risks of a calling. See *Jenkins v. Phoenix Const. Co.,* 129 N. Y. S. 937; *Southern R. Co. v. Foster* (Va.), 69 S. E. 972. While the *Ives* case, *supra,* holds that the elimination *in toto* of this defense condemns the New York act because it makes the master pay when he is not in fault, it clearly indicates that there exists an assumption of risks due to the master's negligence, which the legislature may abolish as a defense, there being in fact a New York statute which does entirely abolish such defense. In *Martin v. Des Moines Ed. L. Co.,* 131 Iowa, at page 735, we say, *arguendo,* while speaking to the question of pleading with reference to burden of proof, and as to what must be affirmatively pleaded, that the expression "risks naturally incident to or inherent in the employment" excludes the idea of negligence. But in the same case, at page 736, we do recognize that, where one remains in service after he knows, or ought to know, his dangers, and does so without promise of remedy, this, also, constitutes an "assumption"—that of assuming the master's negligence—which bars recovery.

In Webb's Pollock on Torts (Enlarged American Edition), page 195, it is said it does not follow that a man is negligent or imprudent because he chooses to encounter a risk which he knows and appreciates, but if he does voluntarily run the risk, he cannot complain afterwards—which is another way of saying that one who goes into an employment knows, or may learn, that among its inherent risks are things which greater care on part of the master might prevent, and that, therefore, the defense of assumption of risk is not wholly based on the claim that without such defense the master would be held when in no degree at fault. 3 Labatt, Sec. 1288, page 3616, asserts that the older authorities construe the words "assumed risk" to cover the defense of contributory neglect as well as that of a contractual assumption of risk, and that this is the correct theory.

Assumption of risk, waiver, and contributory negligence have been treated as interchangeable in Alabama—*Eureka Co. v. Bass*, 81 Ala. 200; and so of *Donahue v. Enterprise R. Co.*, 32 S. C. 299 (11 S. E. 95); and also of Missouri—see *Thorpe v. Missouri Pac. R. Co.*, 2 S. W. 3; *Alcorn v. Chicago & A. R. Co.*, 18 S. W. 188; *Bender v. St. Louis & F. R. Co.*, 37 S. W. 132.

In *Schlemmer v. Buffalo, R. & P. R. Co.*, 205 U. S. 1, the doctrine is put upon peculiar ground—in effect, that, when the servant assumes the inherent risk, he may not recover, because so assuming is a species of negligence on his part; that the assumption in the broad sense "obviously shades into negligence as commonly understood," and that "the preliminary conduct of getting into the dangerous employment or relation is said to be accomplished by the assumption of the risk." The same case indicates strongly that there is little substantial difference between this assumption and contributory negligence, and the text of law writers, and the reports, are full of positive declarations that the two are practically interchangeable.

In *Greef Bros. v. Brown* (Kans.), 51 Pac. 926, assumption

of risks is spoken of as being "a species of contributory negli-. gence." A long line of decisions in Wisconsin, commencing with *Nadau v. White River Lbr. Co.*, 76 Wis. 120, and ending with *Willette v. Rhinelander Paper Co.*, 145 Wis. 537, accept the theory that assumption of risks is "a form of contributory; negligence." *In re Opinion of Justices* (Mass.), 96 N. E. 308, is not an authority either way. It is therein held to be a valid statute which enacts that it shall be no defense that the employe was negligent. That is not a provision that the master must pay, though wholly free from fault, but that he must do so although the servant be in fault. The statute, in effect, takes away the defense of contributory negligence. It is manifest that it does not fix absolute liability on the master because both master and servant may have been negligent. It is a defense with the servant's negligence, and not the entire freedom of fault on part of the master, which the Massachusetts statute deals with.

If assuming the risk amounts to contributory negligence, it cannot be that it assumes only that for which the master is blameless, because there cannot be contributory negligence unless there be negligence to contribute to.

We say, in *Miller v. White Bronze Mon. Co.*, 141 Iowa, at 712, that "of course, facts showing contributory negligence may also prove assumption of risk." We say in the same case that "assumption of risk is, in effect, a waiver of defects and dangers, and a consent on the part of the employe to assume them." And that "this consent is held to take away the injurious character of defendant's act and is bottomed on the old maxim, *Volenti non fit injuria*—that to which a party assents is no wrong." Substantially, this is the holding of *Thomas v. Quartermaine*, L. R., 18 Q. B. 685, and in *Rase v. Minneapolis, St. P. & S. S. M. R. Co.* (Minn.), 120 N. W. 360.

In *Yarmouth v. France*, L. R., 19 Q. B. 647, it is said that, before the Employer's Liability Act, there was this condition in the act of hiring: that if there was a defect in the premises or machinery which was open and palpable, whether the

servant actually knew it or not, he accepted the employment subject to the risk, and "that is the doctrine which is embodied in the maxim." In *Mad River & L. E. R. Co. v. Barber*, 5 O. St. 541, it is laid down that "If the agent or employe waived the omission of duty on the part of the employer he takes the risk upon himself, and if damaged, he must abide by the maxim." In *Schlemmer's* case, 205 U. S. 1, it is said that in this class of cases the risk is said to be assumed because a person who freely and voluntarily encounters it has only himself to thank if harm comes, and that this holding is a recognition of a general principle of the law.

Mr. Labatt, in Vol. 5 of his work (2d Ed.), Sec. 1989, states that the principle embodied in the maxim is recognized, and will preclude recovery in circumstances appropriate for its application; and the following cases hold that the maxim is to be regarded as the embodiment of a comprehensive principle of which the servant's contractual assumption of common risk is one application: *Gibson v. Pacific R. Co.*, 46 Mo. 163; *Louisville, N. O. & T. R. Co. v. Conroy* (Miss.), 56 Am. Rep. 835; *Devitt v. Pacific R. Co.*, 50 Mo. 302; *Mundle v. Hill Mfg. Co.* (Me.), 30 Atl. 16; *Fitzgerald v. Connecticut R. P. Co.* (Mass.), 29 N. E. 464; *Creswell v. Wilmington & N. R. Co.* (Del.), 43 Atl. 629.

And in *Choctaw, O. & G. R. Co. v. Jones* (Ark.), 92 S. W. 244, it is held that the defense of assumed risk comes within the principle expressed by the maxim.

Some of the cases put it on the ground that it is a contract in the nature of a waiver in advance of damages that may accrue.

Very many cases hold that this so-called assumption of risk inheres in the contract of employment. *Martin v. Des Moines Ed. Light Co.*, 131 Iowa 724; *Miller v. White Bronze Monument Co.*, 141 Iowa, at 712; 8 Thompson's Commentaries on Law of Negligence, White's Supplement, Sec. 4608; *Lovell v. De Bardelaben Coal & Iron Co.* (Ala.), 7 So. 756; *Faulkner v. Mammoth Mining Co.* (Utah), 66 Pac. 799; *Smith v. Baker*,

L. R. (1891) A. C. 325, 355, per Lord Watson; *Thomas v. Quartermaine,* L. R. 18 Q. B. 685; *Yarmouth's* case, *supra.*

In *St. Louis Cordage Company v. Miller,* (C. C. A.) 126 Fed. 495, the syllabus written by the circuit judge asserts that it rests on contract; the opinion rests it upon contract, and upon *volenti non fit injuria,* and in *Glenmont Lumber Co. v. Roy,* (C. C. A.) 126 Fed. 524, the same judge rests it on the "right to contract;" and see *Narramore v. Cleveland, C. C. & St. L. R. Co.,* (C. C. A.) 96 Fed. 298, as construed in *Green v. Western Am. Co.* (Wash.), 70 Pac., at 314, 315, left column. On the other hand, it is held that the doctrine is not based on contract. *Rase v. Minneapolis, St. P. & S. S. M. R. Co.* (Minn.), 120 N. W. 360; *Denver & R. G. R. Co. v. Norgate,* (C. C. A.) 141 Fed. 247, 253; *Choctaw, O. & G. R. Co. v. McDade,* 24 Sup. Ct. Rep. 24; *Texas & P. R. Co. v. Archibald,* 18 Sup. Ct. Rep. 777; *Central Vt. R. Co. v. Bethune,* (C. C. A.) 206 Fed. 868; *Worden v. Gore-Meehan Co.* (Conn.), 78 Atl. 422.

We say, in *Martin v. Chicago, R. I. & P. R. Co.,* 118 Iowa, at 151, that as to whether one who undertakes work with knowledge that his employer is ignoring the ordinance and continues at work without complaint, after ascertaining this, assumes the risk of the danger incident to this violation, the authorities are in sharp conflict; that those holding that such a risk is never assumed go on the theory that, as an assumption of risk is based on an implied contract, it would be opposed to sound public policy to prevent one to agree in advance to a violation of a statute or city ordinance; that others say assumption of risks is a term of the contract of employment by which the servant agrees that dangers of injury, obviously incident to the discharge of the servant's duty, shall be at the servant's risk; that, on this theory, no right of action arises for the servant at all, because, under the terms of the employment, the master violates no legal duty to the servant in failing to protect him from dangers the risk of which he agreed expressly to assume; and that, therefore,

the master is not guilty of actionable negligence towards the servant.

Again, it is supported on certain grounds urged in economic theories, and at other times is imputed because of a conception of justice and convenience.

Now it is clear to demonstration that, whensoever it is held that the defense of assumption of risk is based on the doctrine that an injury is not done to the willing, and that to which a person assents is not esteemed, in law, an injury, or that it presents the defense of contributory negligence, or is held to be something other than a claim that the master is wholly free from fault, the defense is not rested upon the assertion that the master is free from fault, but that the servant made a venture with his eyes open to its possibilities, and must not complain of what results therefrom.

The foregoing all tends to demonstrate that the defense of assumption of inherent risks has been put upon so many bases as that, where the legislature expressly provides methods for controverting whether the master was shown to be wholly blameless, we should not impute to it a construction that the defense of assuming risks inherent to an employment is equivalent to a claim that an injury was due to no fault of the master. We should not impute this construction unless no other is possible. So far from finding this to be the situation, we think everything indicates that no such definition of the defense was in the legislative mind when it enacted the legislation now in hearing.

### C.

There is an additional and thoroughly well established and fortified line of reasoning upon which we must reach the same conclusion; and that is, that the courts should never give construction to a statute which will render it unconstitutional, or which may even create serious doubts as to constitutionality; if any other construction be possible, within the bounds of reason.

7. CONSTITU-
TIONAL LAW:
construction,
etc.: construc-
tions leading to
invalidity:
avoidance.

It is possible to claim that the right to make the master absolutely liable is recognized in *Sexton v. Newark Dist. Tel. Co.* (N. J.), 86 Atl. 451, and *City of Chicago v. Sturges,* 32 Sup. Ct. Rep. 92. For the purposes of the argument, we may concede that these cases so hold, but the overwhelming preponderance, in numbers at least, is to the contrary.

In *Parrot v. Wells-Fargo Co.*, 15 Wall. (U. S.) 524, the plaintiff, who was the common landlord of the defendants and other tenants, sought to hold the defendants liable for damages occasioned to the premises occupied by the other tenants by an explosion of nitro-glycerine, which had been delivered for shipment to the defendants as common carriers. It appeared that the defendants were innocent, ignorant of the contents of the package containing the dangerous explosives, and that they were guilty of no negligence in receiving or handling them. Upon these facts, the Federal Supreme Court held that it was a case of unavoidable accident, for which no one was legally responsible.

In *Ohio & M. R. Co. v. Lackey,* 78 Ill. 55, the question was whether the railroad company was liable under a statute which provided "that every railroad company running cars within this state shall be liable for all the expense of the coroner and his inquest, and the burial of all persons who may die on the cars, or who may be killed by collision or other accident occurring to such cars, or otherwise." The act was held invalid because it attached this liability in cases where no default or negligence of any kind on part of the railroad company existed.

To the same effect are numerous cases arising under statutes imposing on railroad corporations absolute liability for killing or injuring animals upon their right of ways by running over them, which all hold such to effect a deprivation of property without due process of law. *Jensen v. Union Pac. R. Co.* (Utah), 21 Pac. 994; *Zeigler v. South & N. A. R. Co.,* 58 Ala. 594; *Birmingham Min. R. Co. v. Parsons.* (Ala.), 13 So. 602; *Bielenberg v. Montana U. R. Co.* (Mont.), 20 Pac.

314; *Schenck v. Union Pac. R. Co.* (Wyo.), 40 Pac. 840; *Cottrel v. Union Pac. R. Co.* (Idaho), 21 Pac. 416.

And while statutes compelling fencing upon pain of additional liability are valid, it is said by Black, in his work on Constitutional Law (2d Ed.), page 351, that even such statutes cannot go beyond imposing a penalty ''in cases where the fault lies at the door of the company. If the law attempts to make such companies liable for accidents which were not caused by their negligence or disobedience of the law, but by the negligence of others, or by uncontrollable causes, or does not give the company opportunity to show these facts in its own defense, it is void.'' See *Steffen v. Chicago & N. W. R. Co.* (Wis.), 50 N. W. 348; *Lewis v. Flint & P. M. R. Co.* (Mich.), 19 N. W. 744; *Bennett v. Ford,* 47 Ind. 264; *Brown v. Collins,* 53 N. H. 442; *Gibbs v. Tally* (Calif.), 65 Pac. 970; *Denver & R. G. R. Co. v. Outcalt* (Colo.), 31 Pac. 177; *South & N. A. R. Co. v. Morris,* 65 Ala. 193; *Chicago, St. L. & N. O. R. Co. v. Moss,* 60 Miss. 641; *Birmingham Min. R. Co. v. Parsons* (Ala.), 13 So. 602.

We have no occasion to decide, and therefore express no opinion on, whether making the master liable absolutely is within the power of the legislature. All we do is to point out that, in the light of the cases to which we have referred, it was, at the time when the Iowa legislature acted, at least a matter for reasonable difference of opinion whether holding the employer to respond when wholly free from blame is a valid exercise of legislative power. Upon this premise, we apply elementary rules of statute construction, to wit, that all doubts shall be resolved in favor of constitutionality (*Dutton Phosphate Co. v. Priest* [Fla.], 65 So. 282; *Cincinnati, W. & Z. R. Co. v. Commissioners,* 1 O. St. at 85), and that it is the duty of the court to give a statute such construction, if possible, as will not render it unconstitutional. *Santo v. State,* 2 Iowa 165, 208; *State ex rel. Weir v. County Judge,* 2 Iowa 280; *Duncombe v. Prindle,* 12 Iowa 1; *Iowa Homestead Co. v. Webster County,* 21 Iowa 221.

"It is elementary when the constitutionality of a statute is assailed if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional, and by the other valid, it is our plain duty to adopt that construction which will save the statute from reasonable claim that it is unconstitutional." *United States v. Delaware & H. Co.*, 213 U. S. 366; *Knights Templars' Indemnity Co. v. Jarman*, 187 U. S. at 205.

And in the words of the Supreme Court of the United States, in *Harriman v. Interstate Com. Commission*, 211 U. S. 407:

"If we felt more hesitation than we do, we still should feel bound to construe the statute not merely so as to sustain its constitutionality, but so as to avoid a succession of constitutional doubts, so far as candor permits."

We must assume that the legislature had some knowledge of the state of the case law when it acted. Construing its act with desire to hold it valid, we should further assume that the law makers took this case law into consideration, and intended to avoid the doubts arising upon such consideration—intended to enact what was clearly valid rather than what seemed at least of questionable validity. We therefore should and do hold that, as the defense of assuming inherent risks of employment does not necessarily mean assuming injury for which the employer is blameless, and no other injuries, and as holding that such assumption does mean such injuries would be a construction which might raise doubts as to the validity of the act, it is our duty, under said rules of construction, to hold that the abolition of said defense of assumption did not enact that utter want of fault on part of the employer is no defense, and so make useless plain and apparently well-considered provisions of the same statute.

It will not be out of place to repeat here the text in 3 Labatt (2d Ed.), Sec. 1186a, pp. 3189, 3190:

"It should be noted that statutes which in terms abolish the doctrine of assumption of risk as a defense go no further

than to abolish the defense where the servant is injured by reason of the master's negligence, and do not abolish assumption of risk where the master has not been negligent.''

We are abidingly of opinion that the act did not abolish the assumption of risk last referred to in the quotation.

III.   In support of the claim that such absolute liability has been created by the act in consideration, three further ''arguments'' are urged upon us:  First, ''primitive'' German law and the common law recognize that fault of the master is not essential to recovery from him by the servant; that this doctrine is still recognized in our jurisprudence; that, under *respondeat superior*, a master free from personal fault must pay if one of his servants be injured by the fault of another; that, in amplification of these, railroads have quite universally been held absolutely liable for injury to passengers, for damage to goods carried, and for fire set by their locomotives.   Second, we are told, with much elaboration, frequently fortified by quotation from ''court decisions,'' that the establishing of absolute liability is just; necessary to changed conditions; beneficial to both employer and employe; a means of bettering citizenship; a relief to the courts and the taxpayers who maintain the courts and litigants; an eliminator of perjury; and by preventing the loss of substantial rights through what are deemed technicalities, an agent for restoring lost confidence in the courts.   Third, that ''an eighteenth century Constitution'' should be interpreted by something broader and more liberal than ''an eighteenth century mind,'' should be construed ''in the light of eighteenth century conditions and ideals;'' and that any other attitude is ''to command the race to halt its progress; to stretch the state upon a veritable bed of Procrustes.''

The entire argument resolves itself into demonstrating that the legislature has and has been held to have the power to create absolute liability; that it is necessary and salutary that it should create it; and that the Constitution should be

8.  Constitutional Law: construction, etc.: "eighteenth century Constitution:" "twentieth century conditions."

read with progressive and liberal eyes. We may concede freely that all this should have consideration upon the question of what a duly enacted law is intended to effect. But, it having been admitted that prior to the enactment of the compensation law the Iowa employer was not under this absolute liability, and that, if there is such liability now, it is created by this particular enactment, just how are all these considerations relevant to the inquiry whether the legislature of Iowa *has* exercised that or any other power in a particular statute enacted by it? That being the range of the inquiry, how does the fact that the legislature has the right to make the change claimed, if it wishes to, bear upon whether, by means of this particular statute, it has seen fit to exercise such right?

"The right of property rests, not upon philosophical or scientific speculations, nor upon the commendable impulses of benevolence or charity, nor yet upon the dictates of natural justice. The right has its foundation in the law."

That can be made or changed by the people, but not by courts.

"In a government like ours theories of public good or necessity are often so plausible or sound as to command popular approval, but courts are not permitted to forget that the law is the only chart by which the ship of state is to be guided."

2.

Not only are these contentions irrelevant, but some of them are open to criticism that goes deeper than irrelevancy.

The rules for dealing with the fundamental law that are urged upon us present, in effect, an assertion that the judges of the present day may repeal the Constitution whenever, in their opinion, that instrument is out of harmony with "the light of twentieth century conditions and ideals." This is akin to the other theory that judges should create law whenever convinced that it is salutary and demanded by the people.

The age of the Constitution, and the enlightenment and progressiveness of the judge have not the slightest bearing upon whether a legislature has or has not made some particular thing into law. Nor is the Constitution a public enemy whom judges are charged to disarm whenever possible. It is the protector of the people, placed on guard by them to save the rights of the people against injury by the people. To hold that attack upon it is for the public good is to commend the soldier for tearing down the rampart which enables him to sleep in safety. The age of the Constitution may develop conditions which make it desirable to amend it; until amended, it is a holy covenant which judges are not at liberty to emasculate by urging a species of statute of limitations. The oath of the judge to support it has neither an express nor implied exception that the oath shall not be binding after the Constitution has been in existence for a stated or any length of time. Unless amended, it will be the duty of the judges who serve a hundred years from now to obey this Constitution. The judge can give no more irrefragable evidence of his utter unfitness for his high trust than that he allows his notions of necessity and justice, or his responsiveness to the public will, to influence him in determining whether a law has been enacted. And in no conceivable case may the just judge give effect to legislation which clearly violates the fundamental law. None but foresworn judges will yield in these to any degree of necessity or pressure of public opinion, or disregard the Constitution because it was created in the eighteenth or nineteenth century. Those who insist most strongly that the courts shall legislate, or set aside the Constitution in a given way and case, will be the most clamant in condemning any such action when it interferes with law that they favor.

We cannot close this subject with words more apt than those written by Mr. Justice Marshall, in concurring with the decision which sustains the validity of the Wisconsin Compensation Act (*Borgnis v. Falk,* 133 N. W. 209):

"The remarks on the court's opinion which may suggest

to some that a different meaning is to be read out of the Constitution now than formerly; that it may have meant one thing when framed and later another, and now be held differently, according to judicial interpretation to meet social necessities as recognized by human instrumentalities in the particular environment—probably was not so intended, but I sense danger of a contrary impression going out. Such ability to bend the fundamental law in the name of judicial interpretation,—the idea that an eighteenth century construction for an eighteenth century condition may not, and at the hands of the court does not have to, fit a twentieth century condition,—has been advanced by some, but not significantly at least by any court. On the contrary, it has met with universal condemnation. That it is wrong, every man of eminence that has ever written upon the subject in the past, as well as the very nature of the case and the very logic and limitations of judicial interpretation, bear witness. The fertile method of dealing with the Constitution has been characterized as one which has 'furnished a mode of argument which would on the one hand leave the Constitution crippled and inanimate, or on the other give it an extent of elasticity subversive of all rational boundaries.' Story, Constitution, 389.''

We concede freely that we should apply anything that is in the Constitution to conditions now existing, and that it was prophetic enough so that it may apply to what may not have existed when it was made. But we deny that we can put things into the Constitution or use it improperly because our present needs might be advantaged by so doing.

The court erred in denying the defense that defendant was wholly free from fault.

### DIVISION II.

Having held that the act does not take away the defense that the master was wholly free from negligence, and that,

therefore, it cannot be violative of fundamental law because
of eliminating such defense, it is possible that, upon retrial,
the defendant may have a verdict upon such defense. In such
circumstances, we would ordinarily decline to consider
whether other features of the statute are open to constitutional
objections. But as the reluctance of the courts to make
inquiry into the power of the legislature to act is, after all,
a mere rule of comity between co-ordinate departments of the
government, and as the parties have fully argued all objections
to the act, and have expressed a desire that the entire contro-
versy be passed upon, and say that so to do is desirable for the
good of the public, and as, owing to the full presentation, what
we shall say cannot be treated as obiter, we have concluded
that we should not here insist upon this rule of comity, and
we proceed to entertain the entire submission.

I. There are some matters presented which should not
be allowed to clog the disposition of what is truly here for
decision.

Both parties fully present the questions of substance
whether the act is constitutional, and of how some vital parts
of it should be interpreted. Both treat the appeal as a test
of this law. In such circumstances, we must
9. **APPEAL AND ERROR: assignments of error: assignments foreign to object of appeal.** decline to pass upon assignments such as that
plaintiff should not have had judgment
because the petition fails to show that he
gave a required notice, or show that he
rejected the law; and because he does not plead that he was
not intoxicated when injured. No possible ruling upon these
would accomplish, or aid in accomplishing, the confessed
object of the appeal.

It is the tendency of arguments asserting that legislation
is violative of constitutions to be hypercritical, and the one at
bar is not exceptional in this regard. In this, an appeal by
an employer, it is urged that the right of rejection by the
employe is unduly clogged; first, because of the requirements
concerning the form and verification of the notice; and second,

because the sufficiency of these is to be passed on by the commissioner and the act is challenged because Section 3 authorizes the commissioner to return a rejection by the employe if it fails to comply in form or verification with the requirements of the act, it being urged that this is power to construe contracts against their terms. And there is a contention that the act is void because it interferes with the exclusive jurisdiction of the Federal courts of actions for injuries of employes of railroads, in that injuries to such employes are not excepted in the act. Sec. 22 of the act guards against this very interference with Federal law. But, in any view, the alleged interference does not concern appellant.

If there is any sphere within which a statute may validly operate, it should, within that sphere, be made effective in appropriate proceedings taken for that purpose. While the application of the statute in a particular case may violate organic law, it may not be unconstitutional as framed when limited to its proper application. *Dutton v. Priest* (Fla.), 65 So. 282. The employer cannot be heard to urge a grievance of the employe in attacking a compensation act. *Jeffrey Mfg. Co. v. Blagg,* 35 Sup. Ct. Rep. 167; *Jensen v. Southern Pac. R. Co.* (N. Y.), 109 N. E. 600.

10. CONSTITU-
TIONAL LAW:
construction,
etc.: bor-
rowed objec-
tion.

As is said in *Dutton's* case (Fla.) 65 So. 282, attacks upon the constitutionality of a statute will not be sustained on the ground that it *may* be so construed as to invade private rights secured by the Constitution, and that he who makes the attack must show that, in the case he presents, the effect of applying the statute is to deprive *him* of a constitutional right.

## 2.

Workmen's acts and the like may validly interfere with existing contracts, if it be done by a proper exercise of the police power. See *Chicago, B. & Q. R. Co. v. McGuire,* 219 U. S. 549; *Philadelphia, B. & W. R. Co. v. Schubert,* 32 Sup. Ct. Rep. 589; *Sexton v. Newark Dist. Tel. Co.* (N. J.), 86

Atl. 451; *State ex rel. Pratt v. City of Seattle* (Wash.), 132 Pac. 45; *State ex rel. Yaple v. Creamer* (Ohio), 97 N. E. 602. But this is for consideration later. And if acceptance of the act is elective, then, as will be seen later, the statute cannot work an impairment. Whenever liberty is left on whether to contract at all (which liberty is assumed for present purposes), then a new contract or a change in contract, made by contract, cannot be objected to as an invalid impairment. Of course, parties *sui juris* and at liberty can make new contracts that modify or obviate existing ones without running counter to any constitutional inhibition.

It suffices, for present discussion, that the statute at bar has not a suggestion that existing contracts are within its contemplation. On the contrary, it provides expressly that existing conditions are not to be affected. Section 51 is, that Part 1 of the act shall take effect from and after July 1, 1914, and Parts 2 and 3 from and after July 4, 1913; that if either serves notice to reject not less than 30 days before July 1, 1914, when Part 1 takes effect, such notice shall have the same force and effect as though Part 1 had taken effect July 4, 1913. Chapter 148 of the Acts of the Thirty-fifth General Assembly, however, enacts that the compensation act shall not apply to injuries sustained which occur prior to the times when the compensation act takes effect in all its parts, and that the law and procedure in force at the time such injury occurs, if before such act takes effect in all its parts, shall be the same as though such act had not been enacted, whether the action is brought before or after the act takes effect in all of its parts. But by some process of reasoning, not clear to us, the conclusion is reached by appellant that the statute in some way does impair the obligation of existing contracts. It may be conceded, for present purposes, that, by possibility, conditions might arise in the application of the statute which would present the question whether it does impair an existing contract. It will be time enough to pass

11. CONSTITU-
TIONAL LAW:
construction,
etc.: theorized
condition: im-
pairment of
contract.

upon the validity of the act as affected by such potential case when such case arises; and it is not amiss to say at this time that the courts will labor diligently to avoid a construction which imputes to a statute the impairment of existing obligations, and will hold that that is not the true interpretation, if any other is in reason attainable. Lewis' Sutherland's Statutory Construction, Sec. 335, and cases cited. And as said in *Dutton's* case, *supra,* we should not nullify a law merely because it is *possible* to construe invalidity into it, nor until complaint is made by one who is being injured by what he complains of.

There is no limit to the injection of academic discussions into an arraignment of a statute, if once the field of possibilities merely be entered. But the fundamental and justified reluctance of the judiciary to sit in judgment upon the acts of its co-ordinate readily accounts for it that it is the well-settled rule to indulge in no such interference by theorizing upon strained contingencies. In the language of *Railway v. Commissioners,* 1 O. St., at 84, approving *City of Lexington v. McQuillan's Heirs,* 9 Dana (Ky.) 513:

"We should be justly chargeable with wandering from the appropriate sphere of the judicial department, were we, by subtle elaboration of abstract principles and metaphysical doubts and difficulties, to endeavor to show that such a power may be questionable, and on such unstable and injudicial ground to defy and overrule the public will, as clearly announced by the legislative organ."

In *Noble State Bank v. Haskell,* 31 Sup. Ct. Rep. 186, the court said:

"In answering that question we must be cautious about pressing the broad words of the 14th Amendment to a drily logical extreme. Many laws which it would be vain to ask the court to overthrow could be shown, easily enough, to transgress a scholastic interpretation of one or another of the great guaranties in the Bill of Rights. They more or less limit the liberty of the individual, or they diminish property to a cer-

tain extent. We have few scientifically certain criteria of legislation, and as it often is difficult to mark the line where what is called the police power of the states is limited by the Constitution of the United States, judges should be slow to read into the latter a *nolumus mutare* as against the lawmaking power."

Again, in the same case, the court was asked whether the state could require all corporations or all grocers to help guarantee each other's solvency, and where the line was to drawn, and the answer was: "The last is a futile question and we will answer the others when they arise."

We should consider practical experience as well as theory in deciding whether a given plan in fact constitutes a taking of property, or something else that is in violation of the Constitution.

### DIVISION III.

The constitutionality of the act is challenged, speaking in general terms, because:

1. It interferes with the right to contract, generally, and, specifically, by fixing a scale of compensation to be made by the employer to the injured employe.

2. It makes arbitrary discriminations by means of improper classifications, and is, so, improper class law.

3. It improperly delegates judicial power and substitutes a hearing and determination which is not due process of law for the right to have due hearing in a proper court.

4. It misuses the taxing power in providing a system by which the employer takes out insurance to assure payment of compensation to his employe.

5. On the whole, it denies due process of law; deprives the defendant of property without due process, and abridges the privileges and immunities of the defendant as a citizen of the United States.

I. Section 8 prohibits any contract, rule, regulation or device whatsoever that shall operate to relieve the employer,

in whole or in part, from any liability created by the act, except as the act provides. Section 18 is that

12. CONSTITU-
TIONAL LAW:
right to con-
tract: invali-
dating con-
tract: work-
men's compen-
sation act.

every device by which the employe is to pay an insurance premium against the compensation provided in the act is null and void, and no wages may be withheld to pay such premium, under penalty by fine; and the employe shall have no power to waive any provisions of the act if thereby is lessened the statute compensation. And Section 13 provides that the amount of compensation fixed by the statute may not be reduced by contribution from employes.

In essence, these are guards against contracts to reduce liability for negligence, and, so far from being an invasion of the right to contract, are precautions against allowing the employer to first accept the act and then avoid its provisions by subterfuge. It is no interference with the right to make agreement that the legislature enacts what it thinks will prevent the breach of an agreement entered into. What is taken away is not the right to bargain, but the right, by deviousness, to break the bargain made.

Aside from that the right to make contracts is not infringed by statutes aimed to insure compliance with contracts entered into, it should not be claimed at this late date that the legislature has no power to prevent contracts between master and servant which fix a low price for, and so stimulate, the killing and maiming of men—contracts which the employe may feel compelled to make to obtain or retain employment.

Section 2071 of the Code, as amended by Chapter 49, Acts of the Twenty-seventh General Assembly, and Chapter 124, Acts of the Thirty-third General Assembly, which is not questioned, expressly provides as to employes of railroads, "No contract which restricts such liability shall be legal or binding." This phase of the statute has had the approval of this court and of the Supreme Court of the United States. In the *McGuire* case, which was sustained by the Supreme Court of

the United States (219 U. S. 549), it is held not to be an inhibited impairment of contract or infringement of the right to contract, to enact that the acceptance of the benefits in a relief department shall not operate as a release and satisfaction of all claims against the employing railroad company. In the *Opinion of the Justices* (Mass.), 96 N. E. 308, it is ruled that the legislature can say that no agreement by an employe to waive his rights to compensation under the Workmen's Compensation Bill shall be valid. The Supreme Court of the United States has held that Congress may, with reference to the Employers' Liability Act of April 22, 1908, declare, validly, that any contract, rule, regulation or device, the purpose or intent of which is to enable the carrier to exempt itself from the liability therein created, shall be void. See *Mondou v. New York, N. H. & H. R. R. Co.*, 32 Sup. Ct. Rep. 169. That is the holding of *State v. Clausen* (Wash.), 117 Pac. 1101, and of *Philadelphia, B. & W. R. Co. v. Schubert*, 32 Sup. Ct. Rep. 589. *Railway v. Schubert, supra*, and *Sawyer v. El Paso & N. E. R. Co.* (Tex.), 108 S. W. 718, so hold as to statutes which declare that acceptance of benefits under a contract of membership in a railway relief department, and such contract of membership, shall not operate as a bar to the recovery of damages for the injury or death of an employe, and that any agreement to that effect is void.

## 2.

Section 3 provides that if, by or on behalf of the employer, any request, suggestion or demand be made that an employe or one seeking employment shall exercise his right to reject the act, there shall arise a conclusive presumption that the employe or applicant was unduly influenced to exercise this right; that the rejection made under such circumstances shall be conclusively presumed to have been procured through fraud, and be null and void.

Section 19 is that any contract or agreement made by any employer, or anyone acting for him, with any employe or other

beneficiary, as to any claim under the provisions of the act, within twelve days after injury, shall be presumed to be fraudulent.

Both these are charged to interfere with the freedom of contract. The first, which makes fraudulent rejection by the servant, if influence has been brought to bear by the employer, is nothing more or less than an exercise of the right of public self-defense. Assuming that there can be a valid compensation act, certainly the legislature may make provision against having the legislative intent as to such act thwarted. To put the ban upon such influences interferes with no right of contract, but simply heads off one method of evading or crippling the act. One underlying purpose of the statute is to promote acceptance by the employe. No valid right is infringed by making taboo the employment of methods that might press the employe to reject. The legislative policy with us is to discourage the sale of intoxicating liquors, and we have a statute, the validity of which has not seriously been questioned, that if one obtain the sale of liquor to him, in violation of law, and pay therefor, he may recover back the payment; if he has not paid, he may defeat the seller's suit for payment. No one thinks these infringe the right to contract; they are proper devices against interference with the policy of the law.

In view of the provision that all agreements to lessen the statute liability are wholly void, the provision concerning the presumption as to agreements made within twelve days after injury is of doubtful need or use. If such agreement made within the twelve days is not for less than the statute compensation, the act does not condemn it. If it is for less, said other provisions make it absolutely void, rather than presumptively fraudulent. But be that as it may, it again is an exercise of proper legislative policy to guard against the chance of obtaining contracts unfair to the employe, at a time when the legislature may well assume that his physical distress and possible financial condition make him unusually

amenable to pressure directed to a waiver of his just rights. It is merely an attempt to prevent fraud in dealing with the servant at a time when, in all probability, he is still undergoing so much suffering as that he may readily be taken advantage of. And, surely, if any and all contracts for less than statute indemnity may validly be declared void *in toto*, there can be no serious claim made against the validity of one which does not of itself invalidate the contract (which it might lawfully do), but merely changes the burden of proof as to the validity of such contracts.

To now, we have dealt with the question now in review as though there were no power in the legislative branch to interfere with the making of a contract, unless its making is in some clear sense a defeat of legislative policy, exercised in forbidding just such contract. Whatever of this aspect the discussion has so far worn is due to an assumption for the sake of argument.

There is power in the legislature to abridge the right of contract in the exercise of what may be termed the general power of community self-defense—the police power—a power already herein adverted to.

**3.**

13. CONSTITU-
TIONAL LAW:
police power:
right to con-
tract: limita-
tions.
    While the right to contract is a property right, like all other property rights it is "subservient to the public welfare," and may be taken by the state in a well-directed effort to promote the public welfare by the exercise of the police power. *Borgnis v. Falk* (Wis.), 133 N. W. 209. It all flows from the old announcement made by Blackstone, that, when men enter into society, as a compensation for the protection which society gives to them, they must yield up some of their natural rights. "The 14th Amendment, however, does not guarantee the citizen the right to make within his state, either directly or indirectly, a contract the making whereof is constitutionally forbidden by the state." *Hooper v. California*, 155 U. S. 648.

The right is "subject to certain limitations which the state may lawfully impose in the exercise of its police power." *Holden v. Hardy*, 169 U. S. 366. The liberty of contract is "subject to the restraints demanded by the safety and welfare of the state." *St. Louis, I. M. & St. P. R. Co. v. Paul*, 173 U. S. 404. To like effect is *State v. Buchanan*, 29 Wash. 602. "It is within the undoubted power of government to restrain some individuals from all contracts, as well as all individuals from some contracts." *Frisbie v. United States*, 157 U. S. 160. No contract may limit the exercise of the police power to the prejudice of the general welfare. *Butchers' Union Co. v. Crescent City Co.*, 4 Sup. Ct. Rep. 652.

The following acts have been sustained, against objection that they impinge upon the protection of contracts and of the right to contract afforded by the Constitution of the United States: A statute fixing minimum charges for the storage of grain and prohibiting contracts for larger ones (*Munn v. Illinois*, 94 U. S. 113); prohibiting attorneys from contracting for a larger fee than $10 for prosecuting pension claims has been held to be a valid exercise of the police power (*Frisbie v. United States*, 157 U. S. 160); so of a statute making it unlawful for employes to work in laundries between the hours of ten P. M. and six A. M. (*Soon Hing v. Crowley*, 113 U. S. 703); an act making it unlawful for any contractor engaged upon a work of public improvement to require or permit any employe to work more than eight hours per day (*Atkin v. State of Kansas*, 24 Sup. Ct. Rep. 124); a statute which forbids a railway employe to contract to assume the risk of hazardous employment or unsafe place to work (*Kilpatrick v. Grand Trunk R. Co.* [Vt.], 52 Atl. 531); or contract excluding defense of other assumptions of risk (*Missouri, K. & T. R. Co. v. Bailey* [Tex.], 115 S. W. 601; *El Paso & S. W. R. Co. v. Alexander* [Tex.], 117 S. W. 927); preventing miners employed at quantity rates from contracting for wages upon the basis of screened coal, instead of the weight of the coal as originally produced in the mine (*McLean v. State of*

*Arkansas,* 29 Sup. Ct. Rep. 206) ; an act of Congress making it a misdemeanor for a ship master to pay any part of wages in advance (*Patterson v. Bark Eudora,* 190 U. S. 169) ; and an act requiring the redemption in cash of store orders or other evidence of indebtedness issued by employers in payment of wages to employes (*Knoxville Iron Co. v. Harbison,* 183 U. S. 13). In *McGuire v. Chicago, B. & Q. R. Co.,* 131 Iowa 340, (219 U. S. 549), the police power sustained a prohibition against reducing liability by means of contractual contribution by the employe to a mutual relief association. Statutes regulating common carriers, pawnbrokers, auctioneers, the inspection and sale of food, providing for mechanics' liens, fixing the age at which persons shall be deemed competent to contract, prescribing the form of promissory notes for a patent right, and the like, limit the natural liberty of contract, but are universally recognized to be safely within the police power.

In *Carter v. Craig* (N. H.), 90 Atl. 598, there is sustained an act imposing a tax on property passing by deed, grant, sale or gift made to take effect in possession or enjoyment after the death of the grantor, with purpose to prevent the use of such conveyances to avoid the payment of taxes on property passing by will, against objection that it is a limitation on the freedom of contract secured by the bill of rights.

In *Cunningham v. Northwestern Imp. Co.* (Mont.), 119 Pac. 554, there is sustained the right of the legislature to pass laws regulating an extra hazardous business, such as coal mining, and to provide for benefits in case of injury or death, and this is put upon the ground that it involves an intention to reduce economic waste, to obviate breaches and dissensions between employers and employes, raises the standard of citizenship, lowers the general burdens of taxation thereby, promotes peace, order and morals, and, ultimately, that such an act is a proper exercise of the police power. Under *Giozza v. Tiernan,* 148 U. S. at 662, this reasoning upholds all enactments which promote the health, morals and education of the citizen, and good order. In *Crowley v. Christensen,* 137 U. S.

86, the police power is said to authorize the regulation of the pursuit "of any lawful trade or business," and that these regulations may be "almost infinite, varying with the nature of the business." In *McGuire v. Chicago, B. & Q. R. Co.*, 131 Iowa, at 360, this court, speaking through Weaver, Judge, declares that "the relations between employer and employe are and always have been recognized as proper subjects of police regulation." In *Barbier v. Connolly*, 113 U. S. 27, the police power is held to sustain legislation which tends to increase the industries of the state, develop its resources and add to its wealth and prosperity. *Kentucky State Journal Co. v. Workmen's Comp. Bd.* (Ky.), 170 S. W. 1166, holds that the right to regulate the management of industries is within the police power, and that workmen's compensation acts are, in so far as they provide for employers' paying into the compensation fund provided for, though they deprive injured employes of a jury trial. Judge Brewer, in *Kansas Pac. R. Co. v. Mower*, 16 Kans. 573, said that this power is one "whose necessity and uses grow with the increasing complexities of our civilization and the increasing diversities in the industries and modes of life." It extends "to the protection of the lives, limbs, health, comfort and quiet of all persons." *Thorpe v. Rutland & B. R. Co.*, 27 Vt. 140, 149; *Railroad Co. v. Husen*, 95 U. S. 465. It has been expressly held that such acts as the one under consideration are sustained by the police power. *State v. Clausen* (Wash.), 117 Pac. 1101; *Stoll v. Pacific Coast Co.*, 205 Fed. 169; *Jensen v. Southern Pac. R. Co.* (N. Y.), 109 N. E. 600.

It may not be doubted that the exercise of the power must not be a mere pretense, and that its exercise is sanctioned only for uses properly within the scope of and the necessity for exercising the power—and that is all that may be claimed for the authorities that deal with the point, such as Cooley, Constitutional Limitations, Chapter 7; *Winter v. Jones*, 10 Ga. 190 (54 Am. Dec. 379); *Railway v. Milwaukee*, 97 Wis., at 422; *Lawton v. Steele*, 152 U. S., at 137; *Yick Wo v. Hopkins*,

118 U. S. 356; *Henderson v. Mayor*, 92 U. S. 259; *Soon Hing v. Crowley*, 5 Sup. Ct. Rep. 731, and *State v. Dalton* (R. I.), 46 Atl. 234.

It will be found that in the foregoing cases there were present laws or ordinances which were clearly a mere attempt to accomplish, in the guise of exercise of the police power, objects that were not a legitimate exercise of that power, or that the discussion proceeds upon what should be done when acts of the assembly or ordinances are of that character. None of this proves that "the entire chapter is unconstitutional and void (*inter alia*) because of being a false pretense merely." That a duly enacted statute is a mere colorable use of the police power is surely not to be presumed. On the contrary, courts will presume that such act is a legitimate exercise of legislative power, and not an attempt to evade the Constitution. *Hanly v. Sims* (Ind.), 94 N. E. 401. The courts do not and should not readily find that the legislature entertained such purpose. In the case of *McLean v. Arkansas*, 211 U. S. 539, 547, it is held that a statute should not be set aside by the judiciary unless it "is unmistakably and palpably in excess of legislative powers." It is said:

"The mere fact that a court may differ with the legislature in its views of public policy, or that judges may hold views inconsistent with the propriety of the legislation in question, affords no ground for judicial interference . . . and it is not to be set aside because the judiciary may be of opinion that the act will fail of its purpose, or because it is thought to be an unwise exertion of the authority vested in the legislative branch of the government."

In *Lochner v. New York*, 198 U. S. 45, an act regulating the hours of service of employes in baking establishments; in *Adair v. United States*, 208 U. S. 161, an act prohibiting the discharge of a servant because he is a member of a labor union; in *Street v. Varney Electrical Supply Co.*, 61 L. R. A. 154, a statute fixing a minimum wage of 20 cents an hour to

be paid to unskilled labor on public works, were respectively held void. In cases of the class of *Palmer v. Tingle,* 55 O. St. 423; *City of Cleveland v. Clements Co.,* 67 O. St. 197; *In re Preston,* 63 O. St. 428, and in *State v. Robins,* 71 O. St. 273, it is held that, for one reason or another, a statute impairing the right freely to contract as to hours of labor was unconstitutional. In the *Lochner* case, the decision is largely controlled by, if, indeed, it does not turn upon, the arbitrary singling out employes in a bakery for the subject of the statute. In *Adair's* case, the act is held to take from the employer the right to discharge the employe with or without reason—held there is no power in the legislature to say he must not discharge because the servant is a member of a labor union. In *Street's* case, the decision is that unskilled labor on public works should not be singled out for the benefit conferred by the statute, and that the legislature may not fix a minimum wage. In all of them was present a control of the right to contract without any election as to whether to submit to the statute regulation or not. Most, if not all, of them involve that the object of the whole act is not within the police power.

The manifest distinction is that the Iowa act leaves both employer and employe the liberty to accept or reject its provisions, and that its requirements in case of acceptance constitute a proper exercise of the police power—such exercise of it as would sustain compulsory acceptance.

II. It is charged that the act creates improper differentiations, because it is arbitrary to except from the operation of the act household or domestic servants, farm or other laborers engaged in agricultural pursuits, and persons whose employment is of a casual nature.

**14. CONSTITUTIONAL LAW: equal protection of laws: classifications: workmen's compensation act.**

As to this, we have to say, first, that such excepting has been quite generally sustained. On complaint by a coal mining company

that a statute exempts household or domestic servants, farm or other employes engaged in agricultural pursuits, and persons whose employment is of a casual nature, and those engaged in clerical labor, it has been held that such differentiation between parties in the class to which defendants such as the one at bar belong, and some or all of these excepted persons, is not arbitrary, but natural and justified, and said that most laws must, in a sense, be special, and that strict equality is neither necessary nor practically obtainable. *Missouri Pac. R. Co. v. Mackey,* 127 U. S. 205; *Minneapolis & St. L. R. Co. v. Herrick,* 127 U. S. 210; *Duncan v. Missouri,* 152 U. S. 377; *McGuire v. Chicago, B. & Q. R. Co.,* 131 Iowa 340 (31 Sup. Ct. Rep. 259, 264).

As we view it, substantially such differentiations as are here challenged have been sustained. *Dirken v. Great Northern Paper Co.* (Me.), 86 Atl. 320, sustains exclusion of those in domestic service and those engaged in agricultural pursuits; *Deibeikis v. Link-Belt Co.* (Ill.), 104 N. E. 211, the excepting those engaged in casual work and clerical and administrative employment in a branch of hazardous business. See *Borgnis v. Falk* (Wis.), 133 N. W. 209; *Consolidated Coal Co. v. People of Ill.,* 22 Sup. Ct. Rep. 616. And see also, *Soon Hing's* case, 5 Sup. Ct. Rep. 730; *Ives v. South Buffalo R. Co.* (N. Y.), 94 N. E. 431; *Jacobson v. Commonwealth of Mass.,* 25 Sup. Ct. Rep. 358.

We shall see, presently, that the power to classify is primarily in the legislature, that the courts accord it the widest latitude in performing this function, and that a classification adopted by it will be sustained unless it is so palpably arbitrary as that there is no room for doubt that discretion has been abused by indulging in an unjustifiable discrimination. Certainly, we should not say the legislature discriminated thus in determining that there were substantial differences in hazard and situation between those within the act and household or domestic servants, farm laborers engaged in agri-

cultural pursuits, and those in an employment of a casual
nature.   Certainly, such finding is in no view palpably arbi-
trary.   On the contrary, it will be found to be the quite spon-
taneous belief of most men that such differences between these
classes exist as reasonably justify the difference in treatment
exhibited by the act.

Now, speaking as to the employes excluded, their exclu-
sion is either the granting of a privilege denied to others or the
imposition of a burden from which others are relieved.   If
the last, it suffices that no excluded person is
here complaining, and that appellant has no
grievance because others are unfairly treated.
Speaking from the angle of those included,
their inclusion is either a burden not placed
on others or a privilege not shared by others.   If the last, there
is no grievance.   One may not well complain of a discrimi-
nation consisting of his being treated better than others.

15. CONSTITU-
TIONAL LAW:
construction,
etc.: bor-
rowed objec-
tion.

Assuming, for the time, that the act is not compulsory,
then excluding these certain employes works discrimination
neither against those excluded nor against those included.   If
it is at the option of those included whether
they will take what the act gives, its opera-
tion upon them is due to consent on their part
that it shall thus operate.   All they need to
do to prevent discrimination against them
consisting of being included when others are
not, is to reject the act.   The moment they reject, they are, for
all practical purposes, as much excluded as those who are
excluded by the words of the statute.

16. CONSTITU-
TIONAL LAW:
equal protec-
tion of laws:
classifica-
tions: optional
application:
effect.

On the other hand, there is nothing in the act to prevent
those excluded from making contracts by which they may
have all that the statute gives to those who accept it.   There
is nothing in the statute which prevents a farmer and his
laborer from entering into contract that, if the laborer be
injured in the course of the employment, the employer shall

not make certain defenses, and that arbitrators, mutually agreed upon, shall award compensation, in accordance with the schedule contained in this act; and they may resort to the general arbitration statutes.

If both those included and those excluded are each permitted to and can readily put themselves into the position of the others, there would seem to be, at most, a purely academic discrimination against either.

### 2.

Next, we are asked to hold that the statute contains an improper classification and an arbitrary differentiation; because, as is claimed, if employer and employe both reject, the employe none the less takes the benefit of the act, and where the master accepts and the employe rejects, the one who rejects gets as much as the one who accepts. We might well dispose of this contention with saying that it deals with what is not in this case. But going beyond that, we find this to be the situation: Section 5 provides that where both reject, the liability of the employer shall be the same as though the employe had not rejected. But this does not stand alone. For paragraph B of Section 3 provides that, if the employe rejects, he must suffer in his suit for injury; that the employer may plead and rely upon "any and all defenses, including those at common law, and the rules and defenses of contributory negligence, assumption of risk, and fellow servant," with certain limitations; and Section 10 is that compensation under the act is to be awarded only if both have done what amounts to acceptance of the act. Construing all together, it is found that the act does penalize the employe who rejects. That the penalties imposed upon the master and the servant may not be precisely the same is, as will presently be seen, not vital, and does not sustain the broad assertion made, that an arbitrary difference is created as to the consequences of conduct which is, in substance, alike.

17. **MASTER AND SERVANT:** workmen's compensation act: rejection by employe: effect.

It may be well said, in passing, that such differences as do exist are sustained by the quite generally accepted doctrine that the freedom to contract is only in theory enjoyed by the employe as fully as by his employer, and that the police power may be invoked to sustain some differentiations in favor of the employe, on the theory that this is a method of protecting him for the public good against the actual inequality between him and his employer.

18. CONSTITU-
TIONAL LAW:
equal protec-
tion of laws:
workmen's
compensation
act: conse-
quences at-
tending ac-
ceptance and
rejection.

**3.**

While it is undoubted that wholly arbitrary classification will not be sustained, such, for instance, as rests wholly on the nature of the employer's business, when it should rest upon difference in the nature of the employment—*Cleveland, C. C. & St. L. R. Co. v. Foland* (Ind.), 91 N. E. 594; *Indianapolis, T. & T. Co. v. Kinney* (Ind.), 85 N. E. 954; or where the exaction of a peddler's license is differentiated on whether the peddler be or be not a veteran of the Civil War—*State v. Garbroski,* 111 Iowa 496; or singling out from the general law of the state only such masters and servants as are railroad employers and employes; and though others are in like situation,—*Chicago, M. & St. P. R. Co. v. Westby* (C. C. A.), 178 Fed. 619, to which, however, *Sonsmith v. Pere Marquette R. Co.* (Mich.), 138 N. W. 347, 356, 360, runs counter,—yet these and others but settle that no discrimination which is palpably arbitrary and unreasonable will be sustained by the courts. But we get nearer to the question in hand by looking into the cases in which confessed discriminations have been sustained, and the general rules upon which courts proceed in dealing with differentiations made by the legislature.

a. As to the general rules applicable, we find that in *Gundling v. Chicago,* 177 U. S. 183, it is declared that regulations of a lawful trade or business are of very frequent occurrence, and that "what such regulations shall be, and to what

particular trade, business or occupation they shall apply, are questions for the state to determine, and their determination comes within the proper exercise of the police power by the state." True, the same court holds, in cases like that of *Gulf, C. & S. F. R. Co. v. Ellis,* 165 U. S. 150 (and it is the holding of *Jolliffe v. Brown,* 14 Wash. 155), that acts imposing an attorney fee for non-payment of or delay in paying claims for damages to or overcharges on freight, stock killed, and the like, are void on the ground that consequences were attached to non-payment of debts of which a railroad was guilty, that were not attached when others were. The reason for this seeming conflict in decision is that in these last the police power was not involved. And the Supreme Court of the United States has more recently held that an attorney fee might validly be exacted for delay in making payment of loss due to setting fire, because such requirement is an exercise of the police power.

b.   It is not fatal that the act does not in legal effect cover the entire field subject to such regulation (*Dutton v. Priest* [Fla.], 65 So. 282); or singles out a particularly hazardous employment and subjects it to burdens not placed on other extra-hazardous employments (*Cunningham v. Northwestern Imp. Co.* [Mont.], 119 Pac. 554); or that it is limited to employes engaged in extra-hazardous work (*State v. Clausen* [Wash.], 117 Pac. 1101). In *Cunningham's* case, *supra,* it is held not to be an arbitrary discrimination that the act makes no difference between employers who are careful and others who are or may be careless. It does not avoid the act that it makes differences in the measure of damages. *Minneapolis & St. L. R. Co. v. Beckwith,* 129 U. S. 26. An act as to closing openings in floors has been sustained, although it distinguished between buildings in cities and buildings in villages as to some requirements, and distinguished between private residences and other structures as to the strength of supports required for joists. *Chicago D. & C. Co. v. Fraley,* 33 Sup. Ct. Rep. 715. In *Field v. Barber Asphalt Pav. Co.,* 194

U. S. 618, there is sustained a statute which provides that a street improvement may not be made if resident owners protest, but fails to give like effect to protest on part of nonresident owners. In *City v. Sturges,* 32 Sup. Ct. Rep. 92, an act is upheld which imposed liability for damage to property caused by mob or riot, and charging cities therewith, although as to liability for like acts done in a village or incorporated town, the county, instead of the village or town, is made responsible. And in *Gentsch v. State,* 71 O. St. 151, a statute for keeping open polls which provided different hours, making the distinction rest on a population of more than 300,000, is held not to be class legislation, though there were but two cities of that size in the state—and we have affirmed the same, in effect.

In *Cargill Co. v. Minnesota,* 180 U. S. 452, a law was sustained which required a state license of owners of elevators on railway right of ways, and not of owners of elevators not so situated. As said in *Missouri Pac. R. Co. v. Mackey,* 8 Sup. Ct. Rep., at 1163, it is simply a question of legislative discretion whether the same liability shall be applied to carriers by canal and stage coaches and to persons using steam in manufactures.

c.    When legislation proceeds under any express power, say, to regulate the removal of causes, the discretion in applying the power and in excepting from the application of the statute is of the widest. *McChesney v. Illinois Cent. R. Co.,* 197 Fed. 85, 86. And so of an exercise of the police power. *Dutton v. Priest* (Fla.), 65 So. 282. So there was sustained the singling out railroads for a prohibition against letting Johnson grass or Russian thistle go to seed. *Missouri, K. & T. R. Co. v. May,* 194 U. S. 267, 269. And so of a law confining what shall constitute a certain misdemeanor to acts of women between the ages of 15 and 30. *People v. Coon,* 67 Hun. (N. Y.) 523, 525.

d.    It is not controlling that some inequality may be occasioned. *Louisville & N. R. Co. v. Melton,* 218 U. S. 36;

*Merchants & Mfrs. Bank v. Commonwealth,* 17 Sup. Ct. Rep. 829; *Missouri Pac. R. Co. v. Mackey,* 127 U. S. 205. And Mr. Justice Brewer said, in *Atchison, T. & S. F. R. Co. v. Matthews,* 174 U. S. 96, 106:

"Indeed, the very idea of classification is that of inequality, so that it goes without saying that the fact of inequality in no manner determines the matter of constitutionality."

No rigid equality is required, and wide latitude by the courts is permitted in the discretion and wisdom of the legislature. *Hayes v. Missouri,* 120 U. S. 68; *Bell's Gap R. Co. v. Pennsylvania,* 134 U. S. 232, 237; *Orient Ins. Co. v. Daggs,* 172 U. S. 557; *Sonsmith's* case (Mich.), 138 N. W. 356, 360; *Dutton's* case (Fla.), 65 So. 282.

e. It suffices if the differentiation "is practicable,"— *Insurance Co. v. Daggs, supra,*—and if the classification and discrimination is "judicious"—*State v. Powers,* 38 O. St. 54, 63.

While not without limit, there are inhibited only "clear and hostile discriminations against particular persons and classes, especially such as are of an unusual character, unknown to the practice of our governments." *Bell's Gap* case, *supra.* Laws exhibiting differentiations are not reviewable unless "palpably arbitrary" (*Insurance Co. v. Daggs, supra*); are "purely fanciful and arbitrary" (*Matheson v. Minneapolis St. R. Co.* [Minn.], 148 N. W. 71; wholly without a reasonable or practical basis (*Dutton's* case [Fla.], 65 So. 282); "so manifest as to leave no room for reasonable doubt" (*Sexton v. Newark Dist. Tel. Co.* [N. J.], 86 Atl. 451). The courts have no right to interfere unless the classification made is so clearly arbitrary as to be violative of constitutional rights (*Cunningham's* case [Mont.], 119 Pac. 554); may interfere only if it is arbitrary to unreasonableness and unjustly discriminative (*Dutton's* case, 65 So. 282, 283); or where it is the plainly evinced legislative purpose to make unjust discrimination, or a false and unnatural classification has been resorted to for the purpose of giving a special law

the appearance of a general one, with intent to evade some constitutional limitation (*Cincinnati St. R. Co. v. Horstman,* 72 O. St. 93, 107).

In *Jeffrey v. Blagg,* 35 Sup. Ct. Rep., at 169, speaking to a classification under which certain defenses were left those who employed less than five, and taken from those who employed more than five, the Supreme Court of the United States said:

"This court has many times affirmed the general proposition that it is not the purpose of the 14th Amendment in the equal protection clause to take from the states the right and power to classify the subjects of legislation. It is only when such attempted classification is arbitrary and unreasonable that the court can declare it beyond the legislative authority. *Lindsley v. Natural Carbonic Gas Co.,* 31 Sup. Ct. Rep. 337, and previous cases in this court cited on page 79. That a law may work hardship and inequality is not enough. Many valid laws, from the generality of their application, necessarily do that, and the legislature must be allowed a wide field of choice in determining the subject-matter of its laws, what shall come within them, and what shall be excluded."

In *Gundling's* case, 177 U. S. 183, the same court says:

"Unless the regulations are so utterly unreasonable and extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily, and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend beyond the power of the state to pass, and they form no subject for Federal interference."

It is an elementary principle in determining the constitutionality of a statute that any reasonable doubt must be solved in favor of the legislative action. *Gates v. Brooks,* 59 Iowa 510. The violation of the Constitution should be clear and apparent before the act may be declared void. *Reed v. Wright,* 2 G. Gr. 15. The power to set aside a law is not to be resorted to unless the case be clear, decisive and unavoidable.

*Santo v. State,* 2 Iowa 165, 208; *McCormick v. Rusch,* 15 Iowa 127. It must be a case of clear, plain and palpable conflict with the Constitution. *Central Iowa R. Co. v. Board of Supervisors,* 67 Iowa 199. Only when the conflict is so clear, palpable and plain as to leave no doubt of the invalidity of the statute in the judicial mind. *Morrison v. Springer,* 15 Iowa 304; *Burlington, C. R. & N. R. Co. v. Dey,* 82 Iowa 312. When the statute is clearly, palpably, plainly and beyond reasonable doubt in conflict with the Constitution. *Stewart v. Board of Supervisors,* 30 Iowa 9.

Surely, the excepting from the act said employes, and the claimed difference in consequences attaching respectively to rejection and acceptance by master and servant, are not so manifestly and palpably arbitrary, and such misuse of the conceded power to classify, as that we should hold the statute void on account of these differentiations.

III.   Section 42 of the act provides that every employer, subject to its provisions, shall insure his liability thereunder in some organization approved by the State Department of

19. CONSTITU-      Insurance, and various provisions go into
TIONAL LAW:
due process:       detail as to this and also supervision and reg-
compelling in-
surance.           ulation of taking and maintaining such insur-

ance.   Still other provisions afford methods by which the insurance can be carried by mutual arrangement by the employer and employe, or under which the employer may carry his own risk; and there are various regulations and supervisions of these other arrangements for carrying insurance, for terminating such arrangements, and the like.

The act in these regards is challenged, first, in a loose way, for so interfering with the right to contract—more specifically because Section 45 denies to employers the right to

elect what plan of insurance they will use;
20. TAXATION:      and lastly, again rather loosely, it is urged
purpose of
tax: compul-       that the entire insurance scheme of the act
sory insur-
ance: police       operates as an unauthorized use of the taxing
power.             power—is, in effect, a tax levied upon the

employer to assure payment for injuries sustained by his employe.

It will be noticed that the condition precedent is that such insurance shall be maintained by "every employer, subject to the provisions of this act." (Sec. 42.) While this clearly shows that no employer is compelled to insure unless he has accepted, and thus become subject to, the act, we shall, for present purposes, deal with this point as though such employers as are named in the act were compelled thereby to perfect and maintain such insurance.

Concede, for the sake of argument, that this part of the statute works a taxation of the employer. Is there any fundamental objection to such a tax as this? It is undoubted that the taxing power may not be used as a subterfuge to accomplish that which is not legitimately for the taxing power; undoubted that its exercise, no matter in what form, can be sustained only where the exaction is, in the sense of the law, for a public use. As is not unusual, the difficulty is not in ascertaining the rule, but in applying it. Why have such statutes as this been upheld as not being violative of the due process clause, and upheld generally?

A compulsory insurance law to provide workmen's compensation by the method of insuring in a state fund has been sustained in the *Clausen* case (Wash.) 117 Pac. 1101, against the objection that it was violative of the due process clause of the Federal Constitution, and sustained as being a reasonable police regulation. What amounts to a compulsory tax, akin in principle to the taxation involved here, is upheld by the Supreme Court of the United States in *Noble's* case (Guaranty of Deposit Act), 31 Sup. Ct. Rep. 186, and followed in *Assaria St. Bank v. Dolley*, 31 Sup. Ct. Rep. 189, upholding compulsory taxation of the banks concerned. *Jensen v. Southern Pac. R. Co.*, the most recent pronouncement by the Court of Appeals of New York, 109 N. E. 600, 604, recognizes that the reasoning in the *Noble* case sustains what may be called taxation features of workmen's compensation acts; and the

court says that a compulsory scheme of insurance to secure injured workmen in hazardous employments and their dependents from becoming objects of charity "certainly promotes the public welfare as directly as does an insurance of bank depositors from loss."

An analysis of these decisions demonstrates that they proceed on the reasoning that the statute does not impose on the employer a liability to pay an employe or his dependents any sum of money whatsoever, but does require that he shall secure to all his employes compensation guaranteed by insurance—require that he do this under regulation by the state on penalty for failure to comply, a penalty imposed on the theory that he commits an unlawful act when he does that or omits that through which the employes and their dependents will suffer, and, so suffering, inflict an injury upon the state. They hold that compensation acts do not enforce individual liability growing out of contract, or liability for a tortious act or omission; that their basic aim is social justice; that they exercise a highly intelligent selfishness in recognizing that there is no ultimate advantage in obtaining products at too low rates on the fictitious basis that such rates include all the cost of the product, when, in truth, the selling price is below cost, because part of the cost is thrown upon the most helpless of the people, in the first instance, which "saving," and more, is ultimately thrown upon the general community, in expense of litigation over accidents, of caring for pauperized victims of the accidents, and in the indefinable, but none the less real and serious, damage to the state growing out of distress and pauperism thus permitted to exist. We so reach the satisfactory conclusion that the only inquiry we need to address ourselves to is whether the so-called taxation involved in the maintenance of insurance be—if a tax, or, though a tax, a tax for a public purpose—sustained by the police power; and we think the cases answer in the affirmative, and that independent thought sustains them.

2.

To paraphrase the inquiry, is such requirement a means of promoting the public welfare; is the premium to be paid an exaction for public use when exacted in order to make more certain that an injured employe shall receive the compensation provided by the legislature? That, in a sense, this is a provision for the benefit of the employe rather than óne directly for the benefit of the public at large may be conceded. But does the concession present a case of improper exercise of the police power? True, it has been held that the taxing power may not be invoked to aid a private enterprise upon the ground that its establishment would be a benefit to the people of the community. *Loan Association v. Topeka,* 20 Wall. 655, 663, 664. *In re Justices* (Mass.), 30 N. E. 1142, declares it is not within the power of the legislature to give a city power to purchase fuel for sale to its citizens, although they may be indigent, in rigorous winters, and have great difficulty in obtaining fuel. True, also, the same authority has declared (*In re Municipal Fuel Plants,* 66 N. E. 25) that, if at any time it should be made to appear that conditions were such that fuel could not be obtained by private enterprise, the court might hold that the municipality was authorized to enter upon the business of conducting fuel yards for the same reasons which authorize one to acquire and maintain water, gas and light plants. Acts have been condemned which appropriated public money for seed grain, and loans to farmers whose crops have been destroyed by hail or storms in a given year (*Deering v. Peterson* [Minn.], 77 N. W. 568); and authorizing townships to issue bonds and use the proceeds to provide destitute citizens of those townships with provisions and with grain for seed and feed (*State v. Osawkee Township,* 14 Kans. 418). So of legislation authorizing a city to issue bonds in order to loan money to owners of buildings to enable them to rebuild property destroyed in the great Boston fire of 1872 (*Lowell v. City of Boston,* 111 Mass. 454); and a similar act

passed in South Carolina (*Feldman v. City Council of Charleston,* 23 S. C. 57 [55 Am. Rep. 6]); and legislation providing for a quarterly payment out of the state treasury to provide relief for worthy blind (*Auditor v. State* [Ohio], 78 N. E. 955); and an act raising taxes to provide treatment for inebriates at institutions devoted to their care and cure (*Wisconsin K. I. Co. v. Milwaukee County* [Wis.], 70 N. W. 68; *State v. Froehlich* [Wis.], 94 N. W. 50); and an inheritance tax imposed for the purpose of paying the expenses of deserving students at the state university (*State ex rel. Garth v. Switzler* [Mo.], 45 S. W. 245); and the use of public funds to erect a building for a Grand Army of the Republic Post (*Kingman v. City of Brockton* [Mass.], 26 N. E. 998); and a tax ordered after the close of the Civil War to pay bounties to soldiers who enlisted during that war (*Mead v. Inhabitants of Acton* [Mass.], 1 N. E. 413); and an act requiring the deduction of a certain percentage of the salaries paid to teachers in public schools for the creation of a pension fund (*State v. Kurtz,* 21 O. C. C. R. 261, and *State v. Hubbard,* 22 O. C. C. R. 252, 267, affirmed in 65 O. St. 574); and a provision that, under the so-called Torrens Registration Act, a system for the registration of land titles, the person first registering a parcel of land should pay a certain sum, based on the value of the land, into an insurance fund for the protection of land titles (*State v. Guilbert,* 56 O. St. 575). In *Louisville & N. R. Co. v. Baldwin* (Ala.), 5 So. 311, an act was avoided which imposed the expenses of examining employes as to color-blindness upon the railroad company who might employ such persons. In *Charlotte, C. & A. R. Co. v. Gibbes,* 142 U. S. 386, the Supreme Court of the United States declared, on the other hand, that such charge against the company was proper. On the whole, however, it is clear that taxes may not be levied for a purely private use. *In re Justices* (Mass.), 30 N. E. 1142, 1144; *Butchers' Union Co. v. Crescent City Co.,* 111 U. S., at 756.

3.

But when all is said, rules of law that such taxes are not sanctioned, and that certain instances of taxation were, therefore, unwarranted, and beyond the power of the legislature, do not settle whether some other attempt at taxation is or is not within the ban. The quarrel is not over the rule that the tax must be for a public use, but over whether its exercise in this case exacts a tax for other than public use. On this problem, ascertaining how far the courts may inquire into the character of the use for which the tax is intended, and of the cases wherein taxation has been sustained, will be found more helpful than the study of cases in which the right to tax has been denied. At the outset, we find the clearly established rule that the courts must not interfere unless the exercise of the police power is an arbitrary invasion of substantial private rights, by means of "illegal or palpably unjust hostile and oppressive exactions, burdens, discriminations or deprivations" (*Dutton v. Priest* [Fla.], 65 So. 282) ; that the legislature, being familiar with local conditions, is primarily the judge of the necessity of such enactments; and that the court should not interfere, no matter what its opinion of the wisdom or necessity of the act, unless the same "is unmistakably and palpably in excess of legislative powers, . . . and has no reasonable relation to the protection of the public health, safety or welfare."

In *Broadhead v. City of Milwaukee*, 19 Wis. 658, 686, it is said that:

"To justify the court in arresting the proceedings and in declaring the tax void, the absence of all possible public interest in the purposes for which the funds are raised must be so clear and palpable as to be perceptible by every mind at the first blush."

In *Sharpless v. Mayor of Philadelphia*, 21 Pa. St. 147, 174, it is declared that a tax law must be considered valid

unless it be for a purpose in which the community has no interest.

It is not a sufficient ground for the interposition of the judiciary that in a sense the tax is to be used for what is both a private and a public benefit; or that others than the taxpayer are benefited.

In *Noble State Bank v. Haskell*, 31 Sup. Ct. Rep. at 300, the levy and collection from every bank existing under state laws of an assessment based on deposits, for the purpose of creating a depositors' guarantee fund, saving harmless a depositor if any such bank becomes insolvent, is held to be for a public use, although, judged from the proximate effect of the taking, the use seems to be a private one. It is said, at pages 186, 187, to be a valid exercise of the police power; that such enactments are to be upheld where the state thinks the public welfare requires them; that such an assessment is not primarily even a private benefit, but tends to make the banking business safe, which is a benefit to the public, because resorting to a bank as a place to keep money is almost compulsory. To the same effect is *State S. & C. Bank v. Anderson* (Calif.), 132 Pac. 755.

The principle has been accepted early in holding that what was, in terms, a tax on owners of dogs to raise a fund for reimbursing the owners of sheep which were killed by dogs, was, in truth, a police regulation. That is the holding of *People v. Van Horn* (Mich.), 9 N. W. 246. And this decision has been followed in a line of cases collected in a note in 17 L. R. A. (N. S.) p. 855. A very interesting and valuable decision which sustains such dog tax is *McGlone v. Womack* (Ky.), 111 S. W. 688. It holds that the purpose of such tax is a public one, and the question of the impossibility of determining who is at fault is discussed as it would be in a workmen's compensation act, and the reasonable character of the tax is established, though it must be said that three justices dissented.

In the *Haskell* case, *supra,* at page 188, it was said that it

would seem there may be many cases of taxation in which the
share of each party in the benefit of a scheme of mutual pro-
tection is sufficient compensation for the correlative burden
that it is compelled to assume; at least, that this is so with
reference to the right to exercise the police power in exacting
such taxation, citing *Ohio Oil Co. v. State of Indiana,* 177 U.
S. 190 (20 Sup. Ct. Rep. 576). In *County of Mobile v. Kim-
ball,* 102 U. S. 691, as approved in *Charlotte, C. & A. R. Co.
v. Gibbes,* 142 U. S. 386, it was held that a provision for the
issuing of bonds by a county could not be declared invalid,
although it imposed upon one county the expense of an
improvement in which the whole state was interested; and so
of work done in a particular county for the benefit of the
public, where the cost is cast upon the county instead of upon
the whole state; that in cases where the interests of the public
and of individuals are blended in any work or service imposed
by law, it is a matter of legislative discretion whether the cost
shall be thrown entirely upon the individuals or upon the
state, or be apportioned between them. In the *Gibbes* case,
*supra,* this doctrine is applied to opening, widening or improv-
ing streets where the owners of adjoining property are com-
pelled to bear the expenses, or part of them, although the work
is done chiefly for the benefit of the public; and to the drain-
ing of marsh lands, where the expense is usually thrown upon
the owners of the property, though the public is directly
interested in removing the causes of malaria; and to quaran-
tine regulations for the protection of the public against the
spread of disease, where the vessel examined is made to pay
for all or part of the expense of examination; and to charging
the railroad with the expense of compulsory examination of
a railroad engineer to ascertain whether he is free from color-
blindness.

In a word, a tax law must be considered valid unless it be
for a purpose in which the community has *no interest* (*Sharp-
less* case, 21 Pa. St. 147, 174); or "if there be the least possi-
bility that it will be promotive in any degree of the public

welfare'' (*Booth v. Town of Woodbury,* 32 Conn. 118, 128).
This disposes of *Lawton v. Steele,* 152 U. S., at 137, in effect
that it is not sufficient that the interests of many persons are
served, but that it must be the interest of the public generally,
as distinguished from those of a particular class.

4.

If a tax raised aids in a scheme to prevent the vast
economic waste which arises from personal injury litigation,
and if it be to the interest of the public to care for the victims
of industrial accidents to the extent, at least, of making com-
pensation sure and free from expense, then such tax is for the
benefit of the public, though it be at the same time beneficial
to a class of citizens. The inquiries to be answered in testing
whether an enactment purporting to be for the promotion
of the public good is fairly within the field of the police power,
are, according to *State v. Redmon* (Wis.), 14 L. R. A. (N. S.)
229, well stated in Freund's Police Power, § 143, thus:

''Does a danger exist? Is it of sufficient magnitude?
Does it concern the public? Does the proposed measure tend
to remove it? Is the restraint or requirement in proportion
to the danger? Is it possible to secure the object sought with-
out impairing essential rights and principles?''

To this we are moved to add that the test is not whether
these conditions do exist, but that the courts may not avoid
such taxation unless it is palpable that the legislature had no
right to assume that such conditions existed, and that being
passed, that the legislature palpably exceeded its powers to
deal with these conditions, if they do exist, or may reasonably
have been held to exist.

We think the authorities and sound reasoning leave no
room for doubt as to how we shall answer whether this was a
justified exercise of the police power. That what the act does
in this regard is a valid exercise of the police power is decided

in *Cunningham's* case (Mont.), 119 Pac. 554; *State v. Clausen* (Wash.), 117 Pac. 1102, 1103; and *Borgnis v. Falk* (Wis.), 133 N. W. 209. In the *Cunningham* case, *supra*, it is declared that this is so, notwithstanding the act operates to the direct benefit of the injured employe or his dependents, and not directly to that of the public generally. In Cooley on Taxation (3d Ed.), page 1125, it is said to be a valid exercise of the power, even though the act does not have the raising of revenue for its object; if it looks rather to the regulation of relative rights, privileges and duties as between individuals, to the conservation of order in the political society, and to the encouragement of industry. The same author says, at page 204:

"The support of paupers and the giving assistance to those who, by reason of age, infirmity or disability, are likely to become such, is, by the practice and the common consent of civilized countries, a public purpose." See *State v. Davidson* (Wis.), 88 N. W. 596 (90 N. W. 1067); *State v. Cassidy*, 22 Minn. 312; *Charlotte, C. & A. R. Co. v. Gibbes*, 12 Sup. Ct. Rep. 255; *Consolidated Coal Co. v. People of Illinois*, 22 Sup. Ct. Rep. 616; *People v. Squire*, 12 Sup. Ct. Rep. 880.

*In re Shattuck* (N. Y.), 86 N. E. 455, bases its decision upon the statement: "In view of the quite universal rule that charitable uses and public uses are synonymous;" and in *Trustees of Firemen's Fund v. Roome*, 93 N. Y. 313, it is held that a particular business could be taxed to support burdens of the government related to such business, and that the support of volunteer firemen disabled by accident, disability, or old age, and their families, is a public purpose.

In principle, the bank deposit guaranty decision is a holding that the taking justified by that statute is a proper exercise of the police power. It does not have a provision more in the public interest than that involved in this case, and the mutual benefits to the parties immediately concerned were not as direct. A compulsory scheme of insurance to secure injured workmen in hazardous employments, and their dependents,

from becoming objects of charity, certainly promotes the pub-lic welfare as directly as does an insurance of bank depositors from loss.

And in *Adler v. Whitbeck,* 44 O. St., at 565, it is held that the inevitable accidents and personal injuries resultant from modern industrialism are a source of burden to the general public beyond those of the pursuits of men in general, and it is within the legislative power to tax the industries respon-sible for that added public burden.

Applying the doctrine of the bank deposit guaranty deci-sion, we find that in this case the mutual benefits are direct. Granted that employers are compelled to insure, and that there is in that sense a taking, they insure themselves and their employes from loss, not others. The payment of the required premium exempts them from further liability. The theoretical taking, no doubt, disappears in practical experience. As a matter of fact, every industrial concern, except the very large ones which insure themselves, have, for some time, been forced by conditions, not by law, to carry accident indemnity insur-ance. The difference is that a relatively small part of the sums thus paid actually reached injured workmen or their dependents.

5.

We do not find the argument persuasive that the act has induced insurance associations to combine and to place the rate of insurance at prohibitive figures. There is no evidence in the record that this is so, notwithstanding that, in argument, reference is made to the biennial report of the Iowa Industrial Commission, speaking to Iowa coal mines. If proven, it would not be controlling; because, first, if the rates are made pro-hibitive, the employer will reject the act, and there will be no insurance taken, which will automatically lead extortioners to mend their way, to avoid killing the goose that lays golden eggs; second, there are more direct and better methods of deal-ing with combinations such as are here charged to exist, than

by declaring an otherwise valid act void, because it requires the employer to insure his liability.

We hold that the insurance features of the act do not invalidate it.

IV.  If the employer and the employe reach an agreement in regard to the compensation under this act, a memorandum thereof shall be filed with the commissioner; and unless he, within twenty days, notify of his disapproval, the agreement stands approved, and is enforceable for all purposes under the provisions of the act.  (Section 26.)

21. CONSTITU-
TIONAL LAW:
distribution of
powers: dele-
gation of judi-
cial power:
workmen's
compensation
act.

If the parties in interest fail to reach an agreement in regard to compensation under the act, either party may notify the commissioner, who thereupon forms a committee of arbitration of three, of which the commissioner is one, and is chairman.  The other two shall be named respectively by the two parties.  If a vacancy occurs, it shall be filled by the party whose representative is unable to act.  (Sec. 27.)  Then come provisions as to the oath to be administered the arbitrators, and other provisions as to filling vacancies.  (Secs. 28, 29.)

It is next provided that the committee shall make such inquiries and investigations as it shall deem necessary, where the inquiry shall be held, and that the decision of the committee, together with a statement of evidence submitted before it, its findings of fact, rulings of law, and any other matters pertinent to questions arising before it, shall be filed with the commissioner.  Unless a claim for a review is filed by either party within five days, the decision becomes enforceable under the provisions of the act.  (Sec. 30.)  The commissioner has power to subpoena, administer oaths, examine such books and records of the parties to a proceeding or investigation as relate to questions in dispute or under investigation, and may make rules and regulations, not inconsistent with the act, for carrying out its provisions.  (Sec. 25.)

If a claim for review is filed, the commissioner shall hear

the parties, and may hear evidence in regard to any or all matters pertinent thereto, and may revise the decision of the committee in whole or in part, or refer the matter back to it for further findings of fact, and he shall file its decision with the record of the proceedings, and notify the parties. No party shall, as a matter of right, be entitled to a second hearing upon any question of fact. (Sec. 33.)

Any party in interest may present certified copy of an order of the commissioner or decision of the committee as to which no claim for review is made, within the time allowed for such presentation, or present a memorandum of agreement approved by the commissioner, and all papers in connection with same, to the district court, whereupon said court shall render decree in accordance therewith, and notify the parties. Such decree shall have the same effect, and in all proceedings in relation thereto shall thereafter be the same, as though rendered in a suit duly heard and determined by said court. But there shall be no appeal from said decree upon questions of fact; nor where the decree is based on an order or decision of the commissioner which has not been presented to the court within ten days after the commissioner gives notice of its filing. Upon the presentation to the court of a certified copy of a decision of the commissioner, ending, diminishing or increasing a weekly payment under the provisions of the act, the court shall revoke or modify the decree to conform to such decision. (Sec. 34.)

Any payment to be made under the act may be reviewed by the commissioner, at the request of either of the parties, and on such review it may be ended, diminished or increased, subject to the maximum or minimum amounts provided for in the act, if the commissioner finds that the condition of the employe warrants such action. (Sec. 35.)

Process and procedure under the act shall be as summary as reasonably may be. (Sec. 25.)

It is interposed that these work an improper delegation of judicial power, and a denial of judicial hearing; that the

courts are compelled to enter judgment upon the award without further hearing; that there is no provision for appeal from the judgment on the award except the limited one permitted by the act; that the judgment must be modified by the court, if modified by the commissioner, and that this works a denial of due process of law, and taking of property without due process of law.

2.

It is not wholly clear that here there is a delegation of judicial power. It might perhaps as well be claimed that what has really been delegated is not judicial power, but power by award and resulting entry of decree to apply the measure of damages created by legislative act,—a delegation of legislative rather than of judicial power; and Chief Justice Marshall said, in *Wayman v. Southhard*, 10 Wheat. 1, that Congress can delegate "what powers it might rightfully exercise itself," and grants of legislative power to subordinate municipal corporations and administrative boards have uniformly been sustained. See *Martin v. Witherspoon*, 135 Mass. 175. According to *Sabre v. Rutland R. Co.* (Vt.), 85 Atl. 694, such acts confer the power upon investigation to apply the general provisions of law to particular circumstances and situations, and may validly leave much of detail to the discretion of a commission; though they may in a sense clothe an administrative body with quasi judicial functions in some respects, this is authorized by the police power, and confers power merely to determine facts upon which existing law shall operate—which is a conferring of auxiliary or subordinate legislative powers. The act takes away the cause of action on the one hand, and the ground of defense on the other, and merges both in a statutory indemnity, fixed and certain. *State v. Clausen* (Wash.), 37 L. R. A. (N. S.) 487.

In *State v. Superior Court* (Wash.), 120 Pac. 861, the public utilities act conferring certain powers on the public service commission is said to be valid against objection that

it is a usurpation of legislative or judicial functions, because the power to be exercised by the commission consists simply in the ascertainment of facts on which the general rule of the legislature and of the Constitution that reasonable rates shall be adopted, operates.

Others of the authorities proceed on the reasoning that the commission and arbitration boards are not courts; that the hearing before them is not the hearing the denial of which is inhibited by the due process clause; that there is no adversative proceeding; that such bodies have, at most, only quasi judicial function; that they are an administrative body or arm of government which, in the course of its administration of a law, are empowered to ascertain some questions of fact, and apply that law thereto; that such are not thereby vested with judicial power in the constitutional sense; that such are executive tribunals, charged with the duty of administering an act of legislature, and of applying the terms of that act to specific cases under the sanction of an agreement to which all persons affected by that act are parties.

### 3.

But assume that the delegation is one of judicial powers. While, if the parties are left wholly free on whether to reject or accept this arbitration and resulting court orders, it is, perhaps, not strictly necessary to determine whether enforced submission to said procedure would be valid, we hold that, even if submission be compulsory, there is here no unwarranted delegation. It does not at all follow from pronouncements that judicial power may not be delegated, that none but duly constituted constitutional courts may exercise judicial power.

22. CONSTITUTIONAL LAW: distribution of powers: workmen's compensation act: judicial power of commissioner and arbitrators.

It is said in *State ex rel. Atty. Gen. v. Hawkins*, 44 O. St. 98:

"What is judicial power cannot be brought within the ring-fence of a definition. It is undoubtedly power to hear and determine; but this is not peculiar to the judicial office. Many

of the acts of administrative and executive officers involve the exercise of the same power.  Boards for the equalization of taxes, of public works, of county commissioners, township trustees, judges of election, viewers of roads, all, in one form or another, hear and determine questions in the exercise of their functions, more or less directly affecting private, as well as public rights.  .  .  .  'The authority to ascertain facts and to apply the law to facts when ascertained, appertains as well to the other departments of the government as to the judiciary.' "

While, says *In re Stockyards Company,* 149 Iowa 5, 11, it is, of course, true that the power to tax, that is, the power to provide the method of taxation and specify the subject-matter to be taxed, is legislative, the determination of questions of fact as to whether particular property comes within the statutory description and particular persons are persons required to pay taxes on property, as well as the determination of the correctness of the method pursued in any particular case, may well be, and often is, strictly judicial.  It holds that, so far as the determination involves the interpretation of the law and the decision of issues of fact on evidence submitted in accordance with the rules of law, it is necessarily judicial in its nature, and that such questions may be left to special tribunals or officers exercising quasi judicial functions, or provision may be made for their determination by courts of law.

We said, in *Denny's* case, 143 Iowa, at 474:

"Of course, the legislature may provide for a review in the courts of the action of a tribunal, legislative in character, which it has required to determine issues of a judicial nature."

In *Sabre v. Rutland R. Co.* (Vt.) 85 Atl. 694, there is sustained an act creating a Board of Railroad Commissioners, and held that it does not conflict with the constitutional provisions as to the distribution of the powers of government, since that provision does not require an absolute separation of functions, but permits those of an administrative office or body to be, to a large extent, judicial and legislative in character; and see *In re Stockyards Company, supra.*

In *Cunningham's* case (Mont.), 119 Pac. 554, a miner's compensation act is upheld which provides a summary method for the disposition of claims filed under the law, and declared that same is not unconstitutional as conferring judicial power on the state auditor having charge thereof.

In *State v. Mountain Timber Co.* (Wash.), 135 Pac. 646, it is held that, as it was the fundamental idea of the industrial insurance act to provide more certain, speedy and adequate compensation for injured employes, there is, therefore, a valid exercise of the police power, and that the provision for its execution by the industrial insurance commission, without the intervention of the courts, is valid, because necessary to carry the idea into effect, even though it might be considered a delegation of judicial power to the commission, and in some cases deny right of trial by jury, contrary to the state Constitution.

### 4.

The following have been held to be a warranted delegation of judicial power: To the commissioner of internal revenue, power to designate marks, brands and stamps required by the act defining butter and imposing a tax on the manufacture of oleomargarine (*In re Kollock*, 17 Sup. Ct. Rep. 444); an act which permits a hearing by the secretary of war on whether a bridge is an unreasonable obstruction to navigation, and authorizes him to require changes that will, in his judgment, render navigation reasonably safe and unobstructed (*Union Bridge Co. v. United States*, 27 Sup. Ct. Rep. 367; *President, etc., Bridge Co. v. United States*, 30 Sup. Ct. Rep. 356); one authorizing a public service commission to investigate the necessity of gates at a crossing near a station used by a large number of persons in going to and from a station, and if it found it dangerous, to require the erection of gates (*Sabre v. Rutland R. Co.* [Vt.], 85 Atl. 694); one authorizing the superintendent of banks to take possession of the property

and business of a bank and retain same until it resumes business or its affairs shall be liquidated, if he believes that the bank is unsafe (*State Sav. & Com. Bank v. Anderson* [Cal.], 132 Pac. 755); a statute requiring the governor and council to order that an outward bound vessel, liable to pilotage if inward bound, shall be held to pay pilotage to the pilot offering his services, whether such services are accepted or not (*Martin's* case, 135 Mass. 175); a provision of a medical practice act authorizing the medical board to refuse or revoke certificates of qualification for certain causes, and providing for an appeal to the governor and attorney general (*France v. State*, 57 O. St. 1). The act at bar can scarcely be claimed to come under the ban, or within the rule of cases like *Board of Education v. State*, 51 O. St. 531, which considered an act of the legislature that undertook to determine that one A. C. Lindsay had a claim against the board of education of a certain township and county, which act directed the board of education to levy a tax for the purpose of paying this claim. Nor is it within *State v. Guilbert*, 56 O. St. 575, wherein the Torrens Registration Act was held invalid because it gave the recorder power: (1) to take proof after notice on whether a mortgage had been discharged, and after a hearing to enter a discharge upon the register; (2) on proof and hearing to make an entry that a lien claimed to be prior had become inoperative in law, by reason of limitation of time; (3) to correct memorials made or issued by mistake, except in cases wherein superior rights had intervened. It is held that, so, a ministerial officer is empowered to apply rules of evidence to the ascertainment of disputed facts, to interpret and apply the statute of limitations, to decide upon law and fact whether mistake has occurred, and who has superior intervening rights against such mistake; and that this is an unwarranted delegation of judicial power, even though appeal is provided.

V.  Contracts by which the parties undertake to deprive themselves *in toto* of the right to resort to the courts to settle

controversies between them, in which are stipulated away all the rights of each or either to resort to the tribunals created by law, have been universally condemned. See *Wood v. Humphrey*, 114 Mass. 185; *Pearl v. Harris*, 121 Mass. 390.; *Barron v. Burnside*, 7 Sup. Ct. Rep., at 931, 935.

23. CONSTITU-
TIONAL LAW:
distribution of
powers: total
ouster of
courts.

Appellant contends that the act violates this rule.

If we assume that the statute would be void if it operated to oust the courts of all jurisdiction to try controversies between employer and employe, it is an immaterial concession in the cases where the act is rejected. For, when rejected, the courts are not ousted of jurisdiction *in toto;* and, as we view it, not deprived of it at all. Where the act is rejected, the full dispute between the parties is still submitted by ordinary proceedings, and tried in the usual way. True, some mere rules of procedure are changed, some defenses are eliminated, and there is some change in burden of proof. Even if it be assumed that these changes are unauthorized, the objection is not sustained that, on rejection of the act, the courts no longer have jurisdiction to try suits for the injury of an employe.

2.

A somewhat more difficult question arises when the provisions of the act are accepted. In that case, if the parties cannot come to an agreement, compensation fixed by statute schedule is awarded by arbitration provided for in the act. In a sense, then, the acceptance of the statute operates to take from the courts so much of the controversy as is determined by the applying of the statute schedules through the agency of the statute arbitrators. Before we reach the question whether, if this constitute a total ouster of the jurisdiction of the courts, it would invalidate the act, we, of course, have to determine whether such total ouster is so effected. We are forced to deal with this question as one of first impression, because no decision that sustains the Compensation Act of other states is applicable. The Washington act and that of

Massachusetts reserve recourse to the courts and full judicial review. In *Sabre's* case (Vt.), 85 Atl. 694, 695, a delegation is sustained because in the end the matter may get to the Supreme Court and have full review. *Borgnis v. Falk Co.* (Wis.), 133 N. W. 209, sustains the Wisconsin act with a holding that there is review if the act be without power, or fraudulent; that if the board act without or in excess of its jurisdiction, there may be action in court to set aside the award, and that this may also be done if its findings of fact are not supported by the evidence. Our act has no such reservations, in terms, and, therefore, these decisions afford us no light.

### 3.

It does not constitute an agreement for complete ouster of the jurisdiction of the courts to provide by contract for the arbitration of special matters, such as agreement concerning the amount of loss due under an insurance policy, an agreement how some facts shall be fixed, and leaving ultimate liability or nonliability to be settled by the courts. Certain facts may be fixed by a person selected by contract for that purpose, so long as the ultimate question at issue may still be litigated in the courts. *Supreme Council v. Forsinger*, 125 Ind. 52; *Whitney v. National Mas. Accident Assn.*, 52 Minn. 378; *Insurance Co. v. Morse*, 20 Wallace 445; *Stephenson v. Piscataqua F. & M. Ins. Co.*, 54 Me. 55; *Mentz v. Armenia Fire Ins. Co.*, 79 Pa. St. 478; *Reed v. Washington F. & M. Ins. Co.*, 138 Mass. 572; *Fox v. Masonic Frat. Accident Assn.*, 96 Wis. 390, 394, 395.

The following cases also throw some light on the question: *Guaranty T. & S. D. Co. v. Green C. S. & M. R. Co.*, 139 U. S. 137; *Gittings v. Baker*, 2 O. St. 21; *Conner v. Drake*, 1 O. St. 166; *Kill v. Hollister*, 1 Wilson (Eng.) 129.

Contracts which provide that the value of certain property, and other like matters, shall be determined by a certain person therein named, and that his decision shall be final, are

usually upheld as lawful, on the ground that they do not oust the courts of their jurisdiction over the subject matter, but only provide a safe and speedy manner of fixing definitely some fact which is usually of a complex and difficult nature, and one that would not be easy to establish by evidence. And such fact, when ascertained and fixed by the person, and in the manner provided by the 'terms of the contract, is established between the parties in the absence of fraud or manifest mistake; but the parties are at liberty, after so fixing such fact, to go into court and litigate such differences as may still exist between them. See *Easton v. Pennsylvania & O. Canal Co.,* 13 Ohio 81; *Mansfield & S. City R. Co. v. Veeder,* 17 Ohio 385; *Mundy v. Louisville & N. R. Co.,* 67 Fed. Rep. 633; *Kane v. Stone Co.,* 39 O. St. 1; *North Leb. R. Co. v. McGrann,* 33 Pa. St. 530 (75 Am. Dec. 624); *Faunce v. Burke,* 16 Pa. St. 469 (55 Am. Dec. 519); *Monongahela Nav. Co. v. Fenlon,* 4 Watts & Sergeant (Pa.) 205; *Hamilton v. Liverpool, L. & G. Ins. Co.,* 136 U. S. 242.

Chapter 14, Title XXI, of the Code of 1897 provides that all controversies which might be the subject of a civil action may be submitted to the decision of one or more arbitrators, as by statute provided; and the submission to arbitrators may be of particular matters or demands, or of all .demands which one party has against the other, or of mutual demands; and it cannot be revoked except on mutual consent. Code Section. 4395 enacts that awards by arbitrators who have been chosen without complying with the provisions of the chapter shall, nevertheless, be valid and binding on the parties thereto as is any other contract, and may be impeached only for fraud or mistake; and even as the award under the compensation act can be made finally effective only by decree of court, so the award of nonstatutory arbitrators can be enforced only by an action. We are not aware it has ever been claimed that such arbitration statutes are void for ousting the courts of jurisdiction, or for any other reason—and this though they provide for submission of the entire dispute by the parties to

arbitration, an extent to which, as will presently be seen, the compensation act does not go.

It has provisions that indicate that it is not intended, literally, at least, to give the statutory arbitrators all the powers that courts have.  For the district court is empowered to enforce, by proper proceedings, the provisions of the section relating to the attendance and testimony of witnesses, and the examination of books and records.  (Sec. 25.)   And provision is made for cases whereby the judge, on notice, may commute future payments to a lump sum, restricted in amount by the statute, and upon payment there shall be a discharge of the employer of all future liability on account of the injury or death, and he be entitled to a duly executed release, upon filing which, the liability of the employer under any agreement, award, finding or judgment shall be discharged of record. (Sec. 15.)

So far as specific delegation goes, the arbitration committee can do no more than to find that the employe should have compensation under some item of the statute schedule; and the commissioner may, on investigation, make a finding that an award thus made shall be modified or terminated. It is manifest that this does not, in terms, deprive the courts of all jurisdiction in the premises.

The very basis of power to award compensation under the act is that its provisions must first be accepted; that the claimant must be an employe; that he must have sustained personal injuries; that they must have arisen out of and in course of the employment; and that the compensation shall be at rates fixed by the statute.  By the terms of Section 10, payment of compensation as per schedule is to be made if employer and employe have accepted the act; and under Section 27, the arbitration committee is formed and proceeds, not because there is a dispute or the material for a lawsuit between employer and employe, but if these fail to reach an agreement "in regard to compensation under this act."

It is significant, too, that appeal is provided from the

decree enforcing the award, on which all save pure questions of fact may be reviewed. For all practical purposes, the rule prevailing in this court, on the law side—for that matter, the language of the grant in the Constitution—take from us the power to pass upon pure questions of fact. The elimination of that power is certainly not the taking of power to review, *in toto.* We hold that, though the act does not, in terms, provide for judicial review, except by said appeal, the statute does not take from the courts all jurisdiction in the premises. Arguing for the validity of the Ohio Compensation Act, the attorney general of that state concedes that if the board allowed nothing, or less than the compensation fixed by statute, court review remains, and that, perhaps, the courts may inquire whether the injury arose in the course of the employment or was self-inflicted.

*Sabre's* case (Vt.), 85 Atl. 694, 695, holds that, as the Constitution provides that courts shall be open for trial of all cases proper for their cognizance, therefore the courts, regardless of statute, may determine whether the board created has gone beyond the powers granted it. We are in no doubt that the very structure of the law of the land and the inherent power of the courts would enable them to interfere, if what we have defined to be the jurisdiction conferred upon the arbitration committee were by it exceeded; that they could inquire whether the act was being enforced against one who had rejected it, whether the claiming employe was an employe, whether he was injured at all, whether his injury was one arising out of such employment, whether it was due to intoxication of the servant, or self-inflicted,—or, acceptance being conceded, into whether an award different from the statute schedules had been made, into whether the award was tainted with fraud on part of the prevailing party or of the arbitration committee, and into whether that body attempted judicial functions, in violation of or not granted by the act.

All of which establishes that the statute works no complete ouster of jurisdiction—the only ouster which is condemned.

The utmost it does is to provide administrative machinery for applying rates of compensation fixed by the legislature, as between parties who have agreed to have the amount·of compensation merely, thus determined. The effect of statutes, never challenged so far as we are advised, which limit recovery for negligence causing death, is to compel the courts to do what here is done by the arbitrators.

4.

That statute sanction of agreements which do divest the courts of all jurisdiction to settle disputes between the contracting parties would nullify such statute is not at all determined by the cases that condemn such agreement. It is one thing that a particular contract is void because the law disapproves it, quite another, that a law is void because it approves rather than disapproves such contract. Whether such statute is valid must depend upon what ground contracts to oust the court of jurisdiction have been held void. If avoided because against public policy—and the avoidance has been put on that ground (see *Fox v. Accident Association*, 96 Wis. 390, 394, 395)—then contracts approved by the legislature are valid against that objection. Since statutes not inhibited by the Constitution bindingly declare that what they enact *is* public policy, a contract expressly authorized by such statute cannot be nullified for being against public policy. Of course, the legislature cannot validate such contract if the Constitution puts all exercise of all judicial powers in the courts; nor any contract that ousts the courts of such jurisdiction as the fundamental law gives to the courts, exclusively.

The true scope of the inquiry is, then, whether our Constitution prevents the delegation of judicial powers by statute—paraphrased, inhibits statutory approval of such delegation by contract.

24. CONSTITU-TIONAL LAW: distribution of powers: judicial powers: right of legislature to delegate.

The provisions of our fundamental law that can be in the least applicable here are the following:

"The judicial power shall be vested in a Supreme Court, district court, and such . . . inferior courts as the general assembly may from time to time establish." Art. 5, Sec. 1.

If this were all, it might be claimed that this vests all judicial power or anything that can be claimed to savor of it exclusively in said courts, and that, therefore, any contract which puts judicial power in any aspect or of any degree elsewhere than in said courts cannot, therefore, be sanctioned by the legislature, nor upheld.

The duty of a court to give a statute such construction, if possible, as will maintain it, rather than one which will render it unconstitutional—*Santo v. State,* 2 Iowa, at 208; *State v. County Judge,* 2 Iowa 280; *Duncombe v. Prindle,* 12 Iowa 1; *Iowa Homestead Co. v. Webster County,* 21 Iowa 221—cannot be well performed unless the Constitution, too, be construed with a view to holding, if in reason possible, that a statute has not violated it. At the least, to arrive at the meaning of words used in a section of the Constitution, interpretation should consider sections preceding and following it having reference to the same subject-matter, unless the words to be construed have such clear and express meaning that there can be but one conclusion as to what was meant. *Allen v. Clayton,* 63 Iowa 11. Construing, then, with consideration of all that is said on the subject, we find, in Section 4 of Article 5, what shows that it was not intended, literally, to keep all judicial power in the Supreme Court; because this latter provides what are clearly limitations, to wit, that the Supreme Court shall have (1) appellate jurisdiction in cases of chancery and in no others, (2) and shall constitute a court for the correction of errors at law, "under such restrictions as the general assembly may by law prescribe." Clearly, this makes Section 1 of the article less than a literal grant of exclusive power, because it not only specifies certain powers when, if there were a grant of

all power, no specification would be necessary, but expressly says that even the given judicial power may be restricted by the legislature. Sec. 6, Art. 5, provides that the District Court has ''jurisdiction in civil and criminal matters arising in their respective districts, in such manner as shall be prescribed by law.'' This, too, indicates that no unlimited exclusive possession of the judicial power is intended.

Our investigation has failed to find a case in which contracts unduly restrictive of the powers of courts have been avoided on the ground that their making was inhibited by a Constitution. And every sanction we have given to any delegation of judicial power to tribunals other than duly constituted judicial tribunals is, of necessity, an interpretation that our Constitution does not prohibit all delegations of such powers. If our fundamental law puts the exercise of all judicial power in the constitutional courts, we should have held that any delegation of such power by the legislature is an unconstitutional enactment. Instead, we have sustained many such, and, additional to the instances heretofore referred to, we hold, in *O'Brien v. Barr*, 83 Iowa 51, that it is constitutional to vest in the executive council the authority to determine in which of the penitentiaries a convict shall be confined; and, in *State v. Mason City & Ft. D. R. Co.*, 85 Iowa 516, that, though the board of railroad commissioners may not be a court, it may still be given jurisdiction to investigate and determine by prescribed rules and judicial inquiry questions submitted to it under statute authority.

It is the holding of *In re Assessment of Stock Yards Co.*, 149 Iowa 5, 10, that the delegation of judicial powers to administrative boards is not a void act because in contravention of Article 3, Section 1, Constitution, which provides that the powers of government of the state are divided into three departments, legislative, executive and judicial, and that no person charged with the exercise of powers properly belonging to one of these departments shall exercise any function apper-

taining to either of the others, except as by the Constitution expressly directed or permitted.

We conclude that the act is not invalid because of effectuating any undue abstraction of the powers of courts.

VI. There is a general challenge that, if the employer rejects the provisions of the act, he is deprived of certain defenses, and it is put epigrammatically that he is deprived of practically all defense if he insists upon his constitutional rights to trial by jury under due process of law. It is advisable to be more temperate in determination than is this indulgence in advocacy.

**25. MASTER AND SERVANT: workmen's compensation act: non-negligence of employer.**

It is complained that the act denies to defendant the right to show that the injury complained of was caused by the negligence of the plaintiff. It does enact that the only negligence of the plaintiff which is available as complete defense is negligence which is self-inflicted or injury which is the result of intoxication. While this is all of the negligence of the plaintiff which so operates, we have held herein that the defendant is left at liberty to prove that, either by reason of the negligence of the plaintiff or for any other reason, the defendant is wholly free from fault. To be sure, under the act it is presumed that the proximate injury was the direct result of negligence on part of the employer, and upon him is the burden of proof to rebut this presumption, and to show affirmatively that no negligence of his is at fault for the injury.

It was never claimed that the Constitution was violated by the rule that the employe had the burden of proving that the master was to blame for his injury, and thus creating a presumption that the injury was not due to the fault of the employer. We are unable to see why the converse of the rule does violate the Constitution. Rules as to such presumptions and as to burden of proof are court-made, and can be changed or abrogated by the legislature.

**26. MASTER AND SERVANT: burden of proof: statutory changes: constitutionality.**

If the courts could place the burden as it was before the

act, it is manifest that the legislature may abolish the court rule and substitute for it one reversing the former rule; and acts that work this change or abrogation come within the words of Mr. Justice Field, quoted in *Magoun v. Illinois T. & S. Bk.*, 170 U. S. 283, 293:

"It is hardly necessary to say that hardship, impolicy or injustice of state laws is not necessarily an objection to their constitutional validity."

In *Mobile, J. & K. C. R. Co. v. Turnipseed,* 31 Sup. Ct. Rep. 136, there is sustained a Mississippi statute under which, in actions against railway companies for damage done to persons or property, proof that the injury was inflicted by the running of locomotives or cars is made prima-facie evidence of negligence.

Cases like that of *Byers v. Meridian Ptg. Co.*, 84 O. St. 408, do not militate against this. It holds that the presumption of malice arising from the publication of libel is not one as to a mere matter of procedure, but is substantive law; and that, as the legislature cannot take away rights which it did not give, it may not ordain that this presumption is rebutted if the publisher of the libel retract.

2.

Contributory negligence, in the sense that, the employer and employe being both negligent, the employe will be defeated, no matter how small was his part in the total of the two negligences, has been taken away.

**27. MASTER AND SERVANT: workmen's compensation act: abolition of defenses: constitutional law.** But it will be found that this act has, in reality, added to the defense of contributory negligence rather than subtracted from it, though not by comparison with what the law of contributory negligence once was. If it were not for this act, all contributory negligence would be available in mitigation only. See Sec. 3593-a of the Supplemental Supplement to the Code of 1915, which is in no way

challenged. By reason of the compensation statute, there is the right so to plead in mitigation, plus the right to plead some contributory negligences in bar.

And if the act is accepted, Section 2 provides that no compensation under the act shall be allowed for any injury caused by the employe's wilful intention to injure himself, or to wilfully injure another; nor if the injury is sustained where intoxication of the employe was the proximate cause of the injury.

We think the *Jeffrey* case, 35 Sup. Ct. Rep. 167, is at least authority for the proposition that abolishing such defenses as contributory negligence, assumed risk and the negligence of fellow servants only, where the employer, being free to accept or reject, rejects, violates no constitutional rights.

### 3.

Taking away the defense that the injury is due to the negligence of a fellow servant, which is done by the act, is not objectionable as illegal classification, nor in any way violative of constitutional rights. *Missouri Pac. R. Co. v. Mackey,* 127 U. S. 205; *Mobile, J. & K. C. R. Co. v. Turnipseed.* 219 U. S. 35; *Watson v. St. Louis, I. M. & S. R. Co.,* 169 Fed. 942.

### 4.

As to the elimination by the act of various defenses resting on risks assumed by the employe. the taking of such defenses has been generally held to be within the power of the legislature. See *Missouri, K. & T. R. Co. v. Bailey* (Tex.), 115 S. W. 601; *El Paso & S. W. R. Co. v. Alexander* (Tex.), 117 S. W. 927.

It has been said of the defenses of assumed risk, and that the injury was the act of a fellow servant, that, having been evolved by the courts, they may properly be abrogated by the legislature. *Borgnis'* case (Wis.), 133 N. W. 209; *Jensen's* case (N. Y.), 109 N. E. 600, 604. And the Supreme Court of the United States has held, in *Mondou v. New York, N. H. &*

*H. R. R. Co.*, 32 Sup. Ct. Rep. 169, that such rules as this are common-law rules. and no one has a vested interest in such rules. See also *State ex rel. Yaple v. Creamer* (Ohio), 97 N. E. 602, 606, left column, and *In re Opinion of Justices* (Mass.), *supra*, and *State v. Clausen* (Wash.), *supra*.

### 5.

It is urged that trial by jury is denied of all issues except the amount of damages, and conceded that, as to the latter, the defendant waived trial by jury. It is urged that such trial is denied without a repeal of Code Sec. 3650, that issues of fact in an ordinary action must be tried by jury unless the same is waived. We hold on this appeal that the statute did not deprive the appellant of the right to a trial by jury in cases where, as here, he rejects the compensation statute, and that the denial is an error in interpretation, rather than obedience to legislative action. Without reference to the constitutional aspects of denying jury trial, the statute cannot be unconstitutional for denying trial by jury if it does not deny such trial.

28. CONSTITU-TIONAL LAW: jury trial: denial of right: workmen's compensation act.

It is true that the statute accomplishes giving the jury less to do than formerly, and changes the character of its work. It can no longer pass upon whether the plaintiff should not be wholly defeated because guilty of some degree of negligence contributing to the injury complained of, and can defeat the plaintiff only if the contribution is by self-infliction, or by negligence due to intoxication. Other contributions will get to it only on a plea in mitigation. The jury will no longer consider whether the plaintiff should be defeated because the evidence shows he assumed the risk of being injured as he was; will not have the question whether there must be a failure to recover because the injury was due to the negligence of a fellow servant. It will not have the question whether the servant has proven that his injury is due to the negligence of the master, and will begin its inquiries by assuming the master was

thus negligent, and next consider whether the employer has proven, notwithstanding this presumption, that he is wholly free from fault. It is self-evident that none of this denies trial by jury, but merely changes the rules under which such trial shall proceed.

Passing abstractions and general discussions, and coming to the question whether the act is invalid because it denies the right to trial by jury in proceedings to administer the act between those who have accepted it, we find it

29. JURY: jury trial: denial: workmen's compensation act: constitutional law.
universally held that in such case it is not a valid objection that jury trial is not provided for. *Sexton v. Newark Dist. Tel. Co.* (N. J.), 86 Atl. 451; *State v. Clausen* (Wash.), *supra; Jensen's* case (N. Y.), 109 N. E. at 603, 604; *Deibeikis'* case (Ill.), *supra; Mellen Lumber Co. v. Industrial Commission* (Wis.), 142 N. W. 187; *Kentucky St. Jour. Co. v. Workmen's Comp. Bd.* (Ky.), 170 S. W. 1166.

The right to jury trial can be waived. Our own statute (Code Sec. 3650) provides, in terms, that the right exists only if it be not waived. It may be conceded that the cases hold, as appellant claims, that the waiver of trial by jury and by due process of law must be by voluntary assent, but it does not follow that constitutional guarantees must be ''expressly'' waived by the party thereby affected.

Proceeding upon this premise, the authorities hold that, whenever two agree to have their difficulties adjusted by a method which excludes trial by jury, they thereby waive the right to such trial; that the right to such trial is waived by electing to come within the act; that such acts take away the cause of action on the one hand and the ground of defense on the other, and merge both in a statutory indemnity, fixed and certain; that for these benefits the parties are required to give up ''the doubtful privilege of having a jury assess his damages, a considerable part of which, if recovered at all, after long delay, must go to pay expenses and lawyer fees.'' In the case of *State v. Mountain Timber Co.,* 135 Pac. 645, it is held

that the right to regulate the management of industries is so within the police power as that workmen's compensation acts are valid, though thereby the injured employe is deprived of a jury trial.

a.   The right to trial by jury is not absolute in the sense that it has universal application.   There is not a general right to such trial in special proceedings.   *Green v. Smith,* 111 Iowa 183; *In re County Printing,* 156 Iowa 282.

30. JURY: right to jury: scope of right.

There are cases holding it to be error to submit some ordinary actions to a jury, even in an advisory way.   *Porter v. Butterfield,* 116 Iowa 725. No jury is allowed in inquests such as juvenile delinquent acts.   The right exists only in cases where it existed at the adoption of the Constitution.   *Cunningham's* case (Mont.) 119 Pac. 554.

b.   The Federal Constitution does not regulate the granting or denying jury trial by the state, but has reference to administration of the Federal law in the Federal courts.

31. JURY: right to jury: Federal Constitution.

*Cunningham's* case, *supra; State v. Mountain Timber Co.* (Wash.), 135 Pac. 645, 646.

No fundamental rights are disturbed because said defenses have been eliminated or modified, nor by changes made in presumption of fact.

**VII.**   Aside from the question whether the act is wrongfully compulsive, there is little more to be said upon the general insistence that the statute violates the guaranties of due

32. CONSTITU-TIONAL LAW: due process: workmen's compensation act.

process of law and of equal protection of the laws, and that it effects a wrongful abridgment of the privileges and immunities of citizenship.

In *Merchants & M. Nat. Bank v. Pennsylvania,* 17 Sup. Ct. Rep. 829, it is said that, as the statute fixes the time when the bank shall make its report to the auditor general of the value of its shares, and directs him to hear the stockholders, it satisfies the requirement as to "due process of law" in tax proceedings, which is that the law shall fix the time and

place at which the assessment is to be made; the rule being that official proceedings are always, in the absence of express provision to the contrary, to be had at the office of the officer charged with the duties.

*Buttfield v. Stranahan,* 24 Sup. Ct. Rep. 349, holds that assuming that no opportunity was afforded by the Tea Inspection Act, 29 Statutes at Large, 604, to an importer of teas for a hearing with reference to the establishing of government standards of purity, quality and fitness for consumption, and the question as to whether his tea should be rejected as not entitled to admission because inferior to government standards, yet the statute is not thereby rendered objectionable as a denial of due process of law.

In *Cunningham's* case (Mont.), 119 Pac. 554, 555, it is held that the phrase "due process of law" does not necessarily mean trial or hearing by judicial proceeding, and in *State Sav. & Com. Bank v. Anderson* (Calif.), 132 Pac. 755, that due process of law does not necessarily imply a regular proceeding in a court of justice. In principle, the decision in *Cunningham's* case, *supra,* is that the power to enact a compulsory law exists, and that such enactment is not in violation of the due process clause of the Federal Constitution. And that is the holding of *In re Opinion of Justices* (Mass.), 96 N. E. 308, and of *Borgnis'* case (Wis.), 133 N. W. 209, wherein it is held that, since the commission administering the workmen's compensation law is a mere administrative board, it had power to investigate or determine facts without notice to the parties of each successive step in the proceedings, without thereby working a denial of "due process of law."

The Washington Compensation Act is sustained against objection that it unduly abridges the privileges and immunities of the citizen, and that it denies the equal protection of the laws. *Clausen's* case, 117 Pac. 1101. So is the Industrial Insurance Law of that state. *State v. Mountain Timber Co.* (Wash.), 135 Pac. 645. The Ohio Employer's Liability

33. CONSTITU-
TIONAL LAW:
privileges and
immunities:
corporations.

Insurance Act is declared to be a valid exercise of legislative power, not repugnant to the Federal or State Constitution, or to any limitation contained in either.  *State v. Creamer* (Ohio), 97 N. E. 602.

Finally, defendant admitted in answer that it is a corporation, and a corporation is not a "citizen" within the protection of the "privileges and immunities" provisions of the Federal Constitution.  *Dutton v. Priest* (Fla.), 65 So. 282; *Paul v. Virginia,* 8 Wall. 168; *Liverpool Ins. Co. v. Massachusetts,* 10 Wall. 566; *Doyle v. Continental Ins. Co.,* 94 U. S. 535; *Lafayette Ins. Co. v. French,* 18 How. (U. S.) 404; *Bank v. Earle,* 13 Pet. (U. S.) 519; *Warren Man. Co. v. Etna Ins. Co.,* 2 Paine (U. S.) 501; *Ducat v. Chicago,* 10 Wall. 410; *Pembina C. S. Mining Co. v. Pennsylvania,* 125 U. S. 181.

The effect of *Kentucky State Journal Co. v. Workmen's Comp. Bd.* (Ky.), 170 S. W. 1166, is to hold the Workmen's Compensation Board Act of Kentucky invalid because the Constitution of Kentucky prohibits the legislature from limiting the amount to be recovered for personal injuries and for injuries resulting in death.

## DIVISION IV.

In our treatment of many objections made, we have assumed, *arguendo,* that the act is compulsory.  In terms, it compels the doing of nothing and the acceptance of nothing, unless its provisions be accepted.  In terms at least, it leaves the parties free whether to accept or reject.  But the complaint is made that, even though this be so, and even though many requirements of the act, if in truth voluntarily accepted, work nothing inhibited by fundamental law, the freedom to take or leave is one in seeming only; that, notwithstanding its protestations to the contrary, the statute exercises unreasonable coercion to induce acceptance of it; and that, if what it provides independently

34. MASTER AND SERVANT: workmen's compensation act: common law defenses: abrogation: constitutional law.

be constitutional, it is yet unconstitutional to compel acceptance of what would be valid if one were truly left free to accept or reject it.

There are some provisions not yet discussed: for instance, the provision of Section 26 that, if the employer and employe reach an agreement in regard to compensation under the act, a memorandum thereof filed with the commissioner is not to be approved by him unless its terms conform to the provisions of the act. Of this it is complained that it compels settlement to be made through the machinery of the statute; that it denies the right of the parties to discuss and settle differences, and so denies the right of contract. The last paragraph in Section 1, that where the parties have not given notice of the election to reject, every contract of hire between them, express or implied, shall be construed as an implied agreement between them on part of one to provide, secure and pay, and on part of the other to accept compensation in the manner provided by the act, is charged to work "arbitrary constructions which deprive defendant of its rights, remedies and property;" and it is said that this is especially accomplished by that part of Section 1 which creates a conclusive presumption that an employer defined by the act has elected to provide, secure and pay compensation according to its terms.

It is complained that, because this conclusive presumption prevails, unless certain prescribed notices are given by him which the statute prescribes terms for, it operates to deprive the employer of an election to remain outside of the penalties of the act. It is difficult to grasp the point that the employer has not such election because he is conclusively presumed to have elected to accept, unless specified notices are by him given. This surely does not compel him to accept the act, but is merely a provision what he must do to avoid a presumption that he has accepted. And it is also difficult to apprehend how this contention can be material here, where defendant concedes in his brief that he has rejected the law.

It is urged that Section 27, providing for the formation of an arbitration committee if the parties fail to reach an agreement in regard to compensation, in some way violates constitutional rights. And of Section 19, which makes presumptively fraudulent any contract or agreement made by the employer with the employe or other beneficiary of any claim under the provision of the act within 12 days after injury, it is said that thereby the state assumes to prevent any adjustment except through arbitration.

The insurance provisions have been noted before. An additional complaint is that insurance must be taken out by certain employers, no matter how small the risk of accident, and that the alternative is being subjected to what amounts to leaving them with "practically no ground of defense." It may not be amiss to again point out that, though no insurance be effected, substantial defenses are still left, if the employer rejects the act, which, as will be shown, he is at liberty to do.

## 2.

Let it be freely conceded that requirement of things proper in themselves may make the statute which requires them void. It is valid to provide a method of arbitration for those who freely accept the statute which provides it, and to limit the amount that shall be paid and received by those who freely submit to that limitation. Statutes have been quite generally enacted, and either never challenged or else sustained, in which the legislature limits the amount that might be recovered—say for death caused by negligence. If this may be done by the legislature, it may, of course, do the lesser, and provide that there shall be no recovery beyond a prescribed amount for an injury due to negligence which does not cause death. By the same token, since the act of assembly is public policy, one who makes a contract that recovery for injury shall have a certain maximum, or be arbitrarily a certain sum, is not violating public policy, if the legislature

affirmatively declares that such limiting is proper. If it be conceded that in the exercise of the police power the legislature may say that, where the parties agree to it, the compensation for injury shall be per schedule enacted by the legislature, it may certainly create a commission or administrative board or body, with power to administer such schedule as between parties who have freely agreed to such application of the schedules by arbitrament.

But all this assumes that the statute is in truth accepted, freely. If that be not so, such provisions as have been instanced may not save the statute, because in themselves proper. One may waive a constitutional right, but cannot be compelled to do so and be arbitrarily subjected to an option to stand upon one right under penalty of losing another. *Byers v. Meridian Printing Co.,* 84 O. St. 408. It would not save the act if every provision in it was itself valid, and though it said, in the plainest words, that all were free to reject it, if the death penalty were to be inflicted on rejection, or if one rejecting were thereupon denied the right to vote or to send his children to the public schools. The test, then, is whether the act in truth resorts to undue compulsion to induce acceptance.

The only compulsion is to eliminate and modify certain defenses, and to change certain court-made rules, already fully discussed. It has already been demonstrated, we think, that such eliminations, modifications and changes are, in themselves, a proper exercise of legislative powers.

In *Jeffrey v. Blagg,* 35 Sup. Ct. Rep. 167, dealing with the validity of the Ohio Compensation Act, which, among other things, was attacked for arbitrarily eliminating defenses like contributory negligence, assumed risk, and the negligence of fellow servants, from larger shops, while leaving them to smaller ones, the court said:

"No employer is obliged to go into this plan. He may stay out of it altogether, if he will."

The Supreme Court of Ohio has upheld the Ohio act on

the ground that it is purely optional and voluntary, both as to employes and employer, in so far as it deals with the requirement that, if the parties concerned elect to accept the act, they shall make certain payments to effectuate insurance against the results of accidents in the employment. Substantially this is affirmed in *In re Opinion of Justices* (Mass.), 96 N. E. 308, as to a statute substantially like the one at bar. It is therein said that, so long as it is elective, an act requiring an employer to become a subscriber, and the employe to waive right to sue at common law and accept compensation provided in the act, violates no constitutional requirement. The same is the holding of the Supreme Court of Wisconsin in *Mellen v. Industrial Commission*, 142 N. W. 187, 189. The *Deibeikis* case (Ill.), 104 N. E. 211, 212, holds that the requirement to arbitrate, being elective, is not an unconstitutional delegation of judicial power to the arbitrator, and parties may validly agree to submit to arbitrators other than the regularly organized courts. The *Borgnis* case (Wis.), *supra,* refuses to accede to the theory that the withdrawal of certain defenses coerces the employer, and that his acceptance coerces the employe, through fear of discharge.

It comes to this: Can a law be void for coercion which attaches no penalty to rejection of its provisions other than taking away, in whole or in part, that which the citizen may lawfully be deprived of without reference to any statute which might be either accepted or rejected? If the legislature may validly say: "You shall not defend with contributory negligence, nor with fault of fellow servants; you must prove you are not in fault for the injury suffered by your servant while doing your work; you must effect insurance so that your insolvency may not leave him a crippled public charge, or make a public burden of his dependents; you may contract with each other to arbitrate summarily, effectively and cheaply, and the award shall be not more than a stated sum, and you shall not contract for less payment"—can validly compel all this without enacting a workmen's compensation act—then

how can the saying that "these things you shall lose and these things you shall do unless you accept the act," be undue compulsion?

One who is at liberty to do or not to do a thing can always say, "I will not do what I can refuse to do, with or without reason, unless you do what I demand." There can be no coercion in the sight of the law effectuated by doing or not doing what one has the absolute right to do or not to do, no matter what terms are attached to doing or refraining. One who has absolute right to do or not to do a thing can attach to his doing or not doing any condition, no matter how unreasonable or arbitrary. The remedy is refusal to accede to the unreasonable demand. To threaten one with suit on a note and resulting costs unless something asked be done, is not duress if the note is confessed and due. One having a house to lease may decline to lease it unless the proposing tenant will agree to stay away from church, or to eat nothing but tomatoes. The remedy is to get another house.

Constitutional rights can be waived. That such waiver itself works a violation of the Constitution, where the inducement to waive does nothing prohibited by the Constitution, is inconceivable.

The only penalty for non-acceptance of this act is the infliction of what the legislature may do in any event. This is not invidious compulsion.

The trial court erred in holding that the act precludes the defense that the employer is in no wise at fault for the injury charged to him. For this, reversal must ensue. In all other respects the decision below is right, and the validity of the statute under consideration is hereby affirmed. It follows: (1) that defendant has the burden of proving that the injury to the plaintiff was not the direct result and did not grow out of the negligence of defendant and that no negligence of defendant was the proximate cause of the injury; (2) that defendant

35. MASTER AND SERVANT: workmen's compensation act: non-accepting employer: contributory negligence as mitigating damages.

has the burden of proving that plaintiff was wilfully negligent, and thus negligent with intent to cause the injury, or that plaintiff's negligence was the result of his intoxication; (3) a defendant may plead other than said contributory negligences on part of plaintiff, but only as in mitigation of damages, in suits brought for injuries sustained after the taking effect of Section 3593-a of the Supplemental Supplement to the Code, 1915, and has the burden of proof on these; (4) any of said matters upon which he has the burden of proof, defendant must plead as a defense, or as matter in mitigation, respectively; (5) on issue's being joined by thus pleading, a jury trial must be had, unless trial by jury is waived.

The Fourteenth Amendment is not violated by the announcing of said rule of pleading.

The cause is remanded for proceeding therewith in all ways not inconsistent with this opinion.

The petitions for rehearing are each—*Overruled. Affirmed* in part and *Reversed* in part.

All the Justices concur.